Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for $2,999.90 which was due him from the Government, but which the Government refused to pay him because it claimed that the plaintiff was indebted to it in *642 that amount in connection with certain lump sum payments for annual leave.
The plaintiff retired from Government service in 1958, having been in that service since 1911. In 1950 he was the Deputy Expediter for Administration in the Office of the Housing Expediter, which office administered rent control legislation. The Office of the Housing Expediter experienced serious difficulties each year in persuading Congress to continue rent control and appropriate money for that purpose. The appropriation for each fiscal year was usually not made until after the fiscal year was well started, and the agency was obliged to operate under make-shift fund arrangements until regular appropriations were made.
Each year rent control was abandoned in additional States, and Congress looked forward to the liquidation of the agency which administered it. The Urgent Deficiency Appropriation Act of 1950, approved March 27, 1950, appropriated $4,000,000 to carry the agency through to June 30, but provided that $2,600,000 of that amount should be available only for the payment of terminal leave. That sum would have been almost enough to pay the entire staff of the agency, 4,153 employees, the lump sum amounts to which they would have been entitled for accumulated annual leave if the agency had been completely liquidated. This appropriation was a strong indication of what Congress hoped the agency would do to itself.
Because there was no legal certainty that the Office of the Housing Expediter would have any funds at all after June 30,1950, the agency on May 26 gave the requisite 30-day notice to all employees that they would be separated on June 30, due to a reduction in force (RIF). The agency also planned to require employees to take a week’s leave without pay in June, in order to eke out its operating funds.
About May 27 the plaintiff Madigan conceived a plan to keep the agency’s operating personnel together until hoped for appropriations were available. The plan was to separate as many of the employees as were willing from their permanent positions, pay them in lump sum for all their accumulated leave, from the large sum which was available only for that purpose, and immediately rehire them in the same *643 positions under temporary appointments. It was apparently thought that if it was not necessary to ask Congress to appropriate a large sum in fiscal 1951 to pay accumulated leave, it might be easier to get money to pay operating expenses.
It is not easy for one not steeped in the learning of the statutes and civil service regulations relating to leave, temporary employees, reinstatements, etc. to have an adequate understanding of the advantages and disadvantages of the plaintiff’s plan.' It was presented to the Housing Expediter, the head of the agency, who caused a staff meeting to be called to consider it. Long and detailed memoranda were prepared by the plaintiff and by Mr. Barr, the General Manager of the agency, presenting the pros and cons of the plan to all of the principal officers of the agency.
The Housing Expediter concluded that the plan was too complicated for general application to the whole staff of the agency but that there was no objection to its application to those employees who chose to make use of it. Those upon whom the Expediter relied for advice in such matters assured him that the plan was legal. They drew this conclusion from published rulings of the Comptroller General, which rulings are quoted in full in our finding 16, and which hold squarely that if a civil servant is transferred from a permanent to a temporary status for leave purposes, he is placed under a different leave system and is entitled to be paid his accumulated leave in a lump sum. In a case not reported by the Comptroller General until 1953, and hence not relied on by the persons who advised as to the legality of the 1950 action in the instant case, the Comptroller General, in 1949, had taken no exception to the action of the Department of the Army in transferring some 3,000 employees from permanent to temporary positions in order to use up an appropriation available for the payment of lump sums for accumulated leave, and thus relieve future appropriations from that charge. See Independent Offices Appropriations for 1954, Hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 83rd Cong., 1st sess., Part 2, p. 498.
Forty-nine employees of the Office of the Housing Expediter, including the plaintiff, elected to come under the *644 plan which the plaintiff had devised. Their permanent appointments were terminated, and they were given temporary appointments to the same positions held by them under their permanent appointments. They claimed and received lump sum payments of their accumulated leave. The plaintiff was paid for 807 hours of accumulated leave. If he had not been paid for this leave, he would have been obliged to use up his 1950 leave in excess of 90 days, the maximum amount which could be carried over beyond the current fiscal year, before June 30,1951, or he would have lost it.
The Housing and Bent Act of 1950 was approved June 23, 1950, having been passed by Congress some days before that. It extended rent controls to December 31, 1950, but provided that any area which voted for continued control would have it until June 30, 1951; that all controls would be terminated immediately in areas which voted for termination ; that controls could be extended at any time by proclamation of the President or by a concurrent resolution of both Houses of Congress. On June 29,1950, Congress made temporary appropriations for the fiscal year 1951 available to Government departments and agencies in such amounts as might be necessary to carry on, at a rate of operations not in excess of that which obtained in the last quarter of the fiscal year 1950. On September 27, 1950, Congress appropriated some $11,000,000 for the Office of the Housing Expediter for fiscal 1951.
In the meantime the Korean war had broken out, rent controls were reestablished and there was work for the employees of the agency. The plaintiff’s temporary appointment was extended, by successive personnel actions, not to exceed November 26, 1950. On November 25 the plaintiff’s temporary appointment was terminated and a “conversion to reinstatement” on a permanent basis was put into effect for him. Since he was changing to an appointment which, under a ruling of the Comptroller General, had a different leave system, he was paid, in a lump sum, for the leave which he had accumulated between July 1 and November 25.
As shown in our finding 31 (b), the Whitten Amendment provided that after September 1, 1950, for the balance of the *645 fiscal year 1951 all reinstatements, transfers or promotions to positions in tbe civil service should be temporary, and that this provision should be enforced by post-audit by the Civil Service Commission or by the appropriate departmental or agency personnel office. The Commission issued instructions as to the application of the Whitten Amendment. The plaintiff interpreted one of these instructions as permitting a “conversion to reinstatement” to a permanent position of one who was already employed by the agency when it did not involve a promotion or an addition to the staff of the agency. This interpretation was, apparently, correct, because, as our finding 38 shows, the Civil Service Commission reviewed all personnel actions of the agency and found that they were “completely in accord with the Commission’s requirements.” As our finding 39 shows, the General Accounting Office in 1951 made an audit of the specific lump sum leave payments here involved, and decided that in view of the Comptroller General’s decisions quoted in our finding 16, no report would be made to the Comptroller General. An “informal exception” was issued to the administrative office of the agency, but was withdrawn when the 1951 Annual and Sick Leave Act was passed, which eliminated the possibility of a recurrence of the personnel action here involved.
Eent control was extended by a succession of statutes to July 31, 1953. The rent control functions of the Office of the Housing Expediter were in 1951 made a part of the functions of the Economic Stabilization Agency. In that agency was set up the Office of Eent Stabilization. The plaintiff Madigan was made the Deputy Director for Administration in that office.
In January, 1953, a United States Senator raised the question of the 1950 annual leave lump sum payments, and in February a number of Senators denounced the transactions on the floor of the Senate. The Subcommittee on Independent Offices of the House Committee on Appropriations held hearings on the subject. The hearings were attended by representatives of the Office of Eent Stabilization, the Civil Service Commission and the Comptroller General. The Act *646 ing Director of the Office of Eent Stabilization testified that the personnel actions were “unethical and not in good propriety.” The representative of the Comptroller General advised the Committee that he could not say whether the actions were legal or not.
The Acting Director of the Office of Eent Stabilization suspended the plaintiff and two other key persons who had participated in the plaintiff’s 1950 plan.
The suspended employees appealed to the Administrator, Economic Stabilization Agency. The Administrator appointed an advisory board of three distinguished persons to make recommendations to him. Their report recommended that the suspended employees be restored to duty. The Administrator refused to follow this recommendation and advised the Acting Director that he approved his action' in suspending the three employees. He said, inter alia, that because the plan was applied to only 49 employees, its objective of improving the 1950 financial position of the agency by relieving itself of the potential charge for accumulated leave was not accomplished to any material or useful extent. The new Director of Eent Stabilization thereupon removed the suspended persons from office April 23, 1953, on the ground that the 1950 personnel action was “not bona fide and not legal.” The Administrator of the Economic Stabilization Agency reversed that action, and directed that the removed employees be restored retroactively to the rolls “on the basis that there are no circumstances warranting removal.”
The Acting Director of Eent Stabilization, in February and again in April 1953, had addressed inquiries to the Civil Service Commission as to the legality of the 1950 actions and as to the correction of the records of the employees involved. The Commission’s answer said that the reinstatements in October and November of 1950 violated the Whitten Amendment but that later changes in the regulations would have accomplished the reinstatements and no corrective action was necessary or would be other than confusing.
On March 4, 1953, the Comptroller General had written the Chairman of the Subcommittee on Independent Offices of the House Appropriations Committee that he had decided *647 that the 1950 payments here in question “were in bad faith, being the result of a contrived series of personnel actions, and for that reason were illegal.” He said that he was modifying, that day, a previous ruling, the ruling which was in effect in 1950 when the actions in question were taken. He said that he intended, in any case where the transactions had resulted in additional cost to the Government, to collect the money from the employees.
The trial commissioner of this court recommended to us the following conclusion of law, based on the law and the facts as he found them.
1. Although plaintiff’s participation in the personnel actions at QBE in 1950 giving rise to the payment to him of lump-sum terminal leave accumulations on two occasions was in good faith and not in knowing and willful violation of the law, but was based on a pardonably erroneous interpretation, the said payments violated the act of December 21, 1944 (5 U. S. C. 61b and 61d), [The Lump-Sum Leave Act], and were an improper use of that part of the appropriation of OHE for the fiscal years 1950 and 1951 earmarked for payment of terminal leave.
We will summarize the actions taken by others in relation to the instant problem.
The Civil Service Commission, specially charged by the Whitten Amendment to require compliance with it, audited the actions in question and found no violation. Three years later it said that the Whitten Amendment had been violated but that later amendments to civil service regulations would have placed the employees in the same status, hence no correction of personnel records was required or would be useful.
The Administrator of the Economic Stabilization Agency first approved the suspension of the plaintiff on the ground that the plaintiff should be made to suffer a “penalty for actions which have violated the standards which should prevail in the Federal service * * Thereupon the plaintiff was discharged, but the Administrator set aside the discharge “on the basis that there are no circumstances warranting removal.”
The Comptroller General held that the 1950 payments “were in bad faith, * * * and for that reason were illegal.” *648 He set aside his former published ruling which had been the basis of the 1950 actions, and substituted a new ruling which made such actions illegal.
The trial commissioner of this court concluded that the 1950 actions were taken in good faith, but that they violated the Lump-Sum Leave Act of 1944, supra.
We agree with our trial commissioner that the actions in question were taken in good faith, and that the conclusion of the Comptroller General that they were illegal, because they were taken in bad faith, cannot be supported. We are impressed, of course, by the fact that he accompanied his conclusion with a ruling which reversed, three years after the events, his published opinion which was relied on when the action was taken in 1950. We are not impressed by the Civil Service Commission’s 1953 dictum that the Whitten Amendment was violated, in the face of its 1950 and 1951 specific review and approval of the action.
We are not persuaded that the June 1950 payment was a violation of the Lump-Sum Leave Act. If it were, we think the Comptroller General’s rulings to the contrary in comparable cases would make it grossly inequitable for him to retroactively reverse his rulings and penalize employees for not being wiser than he was.
The primitive remedy of self-help, resorted to by the Government in this case, is of course permissible, but it is nevertheless harsh. The plaintiff admittedly earned the money for which he sues, but the Government refuses to pay him what he has earned because, it says, it has on another occasion paid him that same amount of money when he was not entitled to it. The Government’s defense is an affirmative one, and it has the burden of supporting it persuasively in law and equity. It has not done so.
The plaintiff is entitled to a judgment for $2,960.84.
It is so ordered.
Laramore, Judge, and Littleton, Judge, concur.