BARR *v.* MATTEO ET AL.

No. 350. Argued April 20, 1959.—Decided June 29, 1959.

*Daniel M. Friedman* argued the cause for petitioner. On the brief were *Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade* and *Bernard Cedarbaum.*

*Byron N. Scott* argued the cause for respondents. With him on the brief was *Richard A. Mehler.*

MR. JUSTICE HARLAN announced the judgment of the Court, and delivered an opinion, in which MR. JUSTICE FRANKFURTER, MR. JUSTICE CLARK, and MR. JUSTICE WHITTAKER join.

We are called upon in this case to weigh in a particular context two considerations of high importance

which now and again come into sharp conflict—on the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities.

This is a libel suit, brought in the District Court of the District of Columbia by respondents, former employees of the Office of Rent Stabilization. The alleged libel was contained in a press release issued by the office on February 5, 1953, at the direction of petitioner, then its Acting Director.[1] The circumstances which gave rise to the issuance of the release follow.

In 1950 the statutory existence of the Office of Housing Expediter, the predecessor agency of the Office of Rent Stabilization, was about to expire. Respondent Madigan, then Deputy Director in charge of personnel and fiscal matters, and respondent Matteo, chief of the personnel branch, suggested to the Housing Expediter a plan designed to utilize some $2,600,000 of agency funds earmarked in the agency's appropriation for the fiscal year 1950 exclusively for terminal-leave payments. The effect of the plan would have been to obviate the possibility that the agency might have to make large terminal-leave payments during the next fiscal year out of general agency funds, should the life of the agency be extended by Congress. In essence, the mechanics of the plan were that agency employees would be discharged, paid accrued annual leave out of the $2,600,000 earmarked for terminal-leave payments, rehired immediately as temporary em-

---

[1] Petitioner was appointed Acting Director of the agency effective February 9, 1953. On February 5 he occupied that position by designation of the retiring Director, who was absent from the city.

ployees, and restored to permanent status should the agency's life in fact be extended.

Petitioner, at the time General Manager of the agency, opposed respondents' plan on the ground that it violated the spirit of the Thomas Amendment, 64 Stat. 768,[2] and expressed his opposition to the Housing Expediter. The Expediter decided against general adoption of the plan, but at respondent Matteo's request gave permission for its use in connection with approximately fifty employees, including both respondents, on a voluntary basis.[3] Thereafter the life of the agency was in fact extended.

Some two and a half years later, on January 28, 1953, the Office of Rent Stabilization received a letter from Senator John J. Williams of Delaware, inquiring about the terminal-leave payments made under the plan in 1950. Respondent Madigan drafted a reply to the letter, which he did not attempt to bring to the attention of petitioner, and then prepared a reply which he sent to petitioner's office for his signature as Acting Director of the agency. Petitioner was out of the office, and a secretary signed the submitted letter, which was then delivered by Madigan to Senator Williams on the morning of February 3, 1953.

On February 4, 1953, Senator Williams delivered a speech on the floor of the Senate strongly criticizing the

---

[2] This statute, part of the General Appropriation Act of 1951, provided that:

"No part of the funds of, or available for expenditure by any corporation or agency included in this Act, including the government of the District of Columbia, shall be available to pay for annual leave accumulated by any civilian officer or employee during the calendar year 1950 and unused at the close of business on June 30, 1951 . . . ."

[3] The General Accounting Office subsequently ruled that the payments were illegal, and respondents were required to return them. Respondent Madigan challenged this determination in the Court of Claims, which held that the plan was not in violation of law. *Madigan* v. *United States*, 142 Ct. Cl. 641.

plan, stating that "to say the least it is an unjustifiable raid on the Federal Treasury, and heads of every agency in the Government who have condoned this practice should be called to task.". The letter above referred to was ordered printed in the Congressional Record. Other Senators joined in the attack on the plan.[4] Their comments were widely reported in the press on February 5, 1953, and petitioner, in his capacity as Acting Director of the agency, received a large number of inquiries from newspapers and other news media as to the agency's position on the matter.

On that day petitioner served upon respondents letters expressing his intention to suspend them from duty, and at the same time ordered issuance by the office of the press release which is the subject of this litigation, and the text of which appears in the margin.[5]

---

[4] The plan was referred to by various Senators as "a highly questionable procedure," a "raid on the Federal Treasury," "a conspiracy to defraud the Government of funds," "a new racket," and as "definitely involv[ing] criminal action." It was suggested that it might constitute "a conspiracy by the head of an agency to defraud the Government of money," and that "it is highly irregular, if not actually immoral, for the heads of agencies to use any such device . . . ." 99 Cong. Rec. 868–871.

[5] "William G. Barr, Acting Director of Rent Stabilization today served notice of suspension on the two officials of the agency who in June 1950 were responsible for the plan which allowed 53 of the agency's 2,681 employees to take their accumulated annual leave in cash.

"Mr. Barr's appointment as Acting Director becomes effective Monday, February 9, 1953, and the suspension of these employees will be his first act of duty. The employees are John J. Madigan, Deputy Director for Administration, and Linda Matteo, Director of Personnel.

" 'In June 1950,' Mr. Barr stated, 'my position in the agency was not one of authority which would have permitted me to stop the action. Furthermore, I did not know about it until it was almost completed.

" 'When I did learn that certain employees were receiving cash

Respondents sued, charging that the press release, in itself and as coupled with the contemporaneous news reports of senatorial reaction to the plan, defamed them to their injury, and alleging that its publication and terms had been actuated by malice on the part of petitioner. Petitioner defended, *inter alia,* on the ground that the issuance of the press release was protected by either a qualified or an absolute privilege. The trial court overruled these contentions, and instructed the jury to return a verdict for respondents if 'it found the release defamatory. The jury found for respondents.

Petitioner appealed, raising only the issue of absolute privilege. The judgment of the trial court was affirmed by the Court of Appeals, which held that "in explaining his decision [to suspend respondents] to the general public [petitioner] . . . went entirely outside his line of duty" and that thus the absolute privilege, assumed otherwise to be available, did not attach. 100 U. S. App. D. C. 319, 244 F. 2d 767. We granted certiorari, vacated the Court of Appeals' judgment, and remanded the case "with directions to pass upon petitioner's claim of a qualified

annual leave settlements and being returned to agency employment on a temporary basis, I specifically notified the employees under my supervision that if they applied for such cash settlements I would demand their resignations and the record will show that my immediate employees complied with my request.

" 'While I was advised that the action was legal, I took the position that it violated the spirit of the Thomas Amendment and I violently opposed it. Monday, February 9th, when my appointment as Acting Director becomes effective, will be the first time my position in the agency has permitted me to take any action on this matter, and the suspension of these employees will be the first official act I shall take.'

"Mr. Barr also revealed that he has written to Senator Joseph McCarthy, Chairman of the Committee on Government Operations, and to Representative John Phillips, Chairman of the House Subcommittee on Independent Offices Appropriations, requesting an opportunity to be heard on the entire matter."

privilege." 355 U. S. 171, 173. On remand the Court of Appeals held that the press release was protected by a qualified privilege, but that there was evidence from which a jury could reasonably conclude that petitioner had acted maliciously, or had spoken with lack of reasonable grounds for believing that his statement was true, and that either conclusion would defeat the qualified privilege. Accordingly it remanded the case to the District Court for retrial. 103 U. S. App. D. C. 176, 256 F. 2d 890. At this point petitioner again sought, and we again granted certiorari, 358 U. S. 917, to determine whether in the circumstances of this case petitioner's claim of absolute privilege should have stood as a bar to maintenance of the suit despite the allegations of malice made in the complaint.

The law of privilege as a defense by officers of government to civil damage suits for defamation and kindred torts has in large part been of judicial making, although the Constitution itself gives an absolute privilege to members of both Houses of Congress in respect to any speech, debate, vote, report, or action done in session.[6] This Court early held that judges of courts of superior or general authority are absolutely privileged as respects civil suits to recover for actions taken by them in the exercise of their judicial functions, irrespective of the motives with which those acts are alleged to have been performed, *Bradley* v. *Fisher,* 13 Wall. 335, and that a like immunity extends to other officers of government whose duties are related to the judicial process. *Yaselli* v. *Goff,* 12 F. 2d 396, aff'd *per curiam,* 275 U. S. 503, involving a Special Assistant to the Attorney General.[7] Nor has the privilege been confined to officers of the legislative and judi-

---

[6] U. S. Const., Art. I, § 6. See *Kilbourn* v. *Thompson,* 103 U. S. 168.

[7] See also *Cooper* v. *O'Connor,* 69 App. D. C. 100, 99 F. 2d 135; compare *Brown* v. *Shimabukuro,* 73 App. D. C. 194, 118 F. 2d 17.

cial branches of the Government and executive officers of the kind involved in *Yaselli*. In *Spalding* v. *Vilas*, 161 U. S. 483, petitioner brought suit against the Postmaster General, alleging that the latter had maliciously circulated widely among postmasters, past and present, information which he knew to be false and which was intended to deceive the postmasters to the detriment of the plaintiff. This Court sustained a plea by the Postmaster General of absolute privilege, stating that (498–499):

> "In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals." [8]

---

[8] The communication in *Spalding* v. *Vilas* was not distributed to the general public, but only to a particular segment thereof which had a special interest in the subject matter. Statements issued at the direction of Cabinet officers and disseminated to the press in the form of press releases have also been accorded an absolute privilege, so long as their contents and the occasion for their issuance relate to the duties and functions of the particular department. *Mellon* v. *Brewer*, 57 App. D. C. 126, 18 F. 2d 168; *Glass* v. *Ickes*, 73 App. D. C. 3, 117 F. 2d 273.

The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. The matter has been admirably expressed by Judge Learned Hand:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alter-

572

native. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581.

We do not think that the principle announced in *Vilas* can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts.[9] The privilege is not a badge or emolument of exalted office, but an expression of a policy

---

[9] As to suits for defamation see, *e. g., Taylor* v. *Glotfelty*, 201 F. 2d 51; *Smith* v. *O'Brien*, 66 App. D. C. 387, 88 F. 2d 769; *De Arnaud* v. *Ainsworth*, 24 App. D. C. 167; *Farr* v. *Valentine*, 38 App. D. C. 413; *United States to use of Parravicino* v. *Brunswick*, 63 App. D. C. 65, 69 F. 2d 383; *Carson* v. *Behlen*, 136 F. Supp. 222; *Tinkoff* v. *Campbell*, 86 F. Supp. 331; *Miles* v. *McGrath*, 4 F. Supp. 603. See also, as to other torts, *Jones* v. *Kennedy*, 73 App. D. C. 292, 121 F. 2d 40; *Adams* v. *Home Owners' Loan Corp.*, 107 F. 2d 139; *Gregoire* v. *Biddle*, *supra*; *De Busk* v. *Harvin*, 212 F. 2d 143; *Lang* v. *Wood*, 67 App. D. C. 287, 92 F. 2d 211.

designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.[10]

To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to "matters committed by law to his control or supervision," *Spalding* v. *Vilas, supra,*

---

[10] See the striking description in Cummings and McFarland, Federal Justice (1937), pp. 80–81, quoted in *Cooper* v. *O'Connor, supra,* 69 App. D. C. 100, 107, 99 F. 2d 135, 142, n. 28, of the office of Attorney General of the United States in the early days of the Republic:

"Not only were there no records but the government provided neither an office nor clerical assistance. As far back as December 1791, Attorney General Randolph, through President Washington, without success had urged Congress to provide a clerk. President Madison, when it became evident that residence at Washington had greatly increased the Attorney General's labor, in 1816 urged that he be supplied with 'the usual appurtenances to a public office.' A bill to provide offices and a clerk came to the Senate floor on January 10, 1817. . . . Thirty years had passed since the federal government was first organized. Now, Congress provided offices in the Treasury and a clerk at $1,000 a year, with an additional small contingent fund of $500 for such essentials as stationery, fuel, and 'a boy to attend the menial duties.' "

at 498—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

Judged by these standards, we hold that petitioner's plea of absolute privilege in defense of the alleged libel published at his direction must be sustained. The question is a close one, but we cannot say that it was not an appropriate exercise of the discretion with which an executive officer of petitioner's rank is necessarily clothed to publish the press release here at issue in the circumstances disclosed by this record. Petitioner was the Acting Director of an important agency of government,[11] and was clothed by redelegation with "all powers, duties, and functions conferred on the President by Title II of the Housing and Rent Act of 1947 . . . ."[12] The integrity of the internal operations of the agency which he headed, and thus his own integrity in his public capacity, had been directly and severely challenged in charges made on the floor of the Senate and given wide publicity; and without his knowledge correspondence which could reasonably be read as impliedly defending a position very different from that which he had from the beginning taken in the matter had been sent to a Senator over his signature and incorporated in the Congressional Record. The issuance of press releases was standard agency practice, as it has become with many governmental agencies in these times. We think that under these circumstances a publicly expressed statement of the position of the agency head, announcing personnel action which he planned to take in reference to the charges so widely disseminated to

---

[11] The record indicates that in 1950 the Office of Housing Expediter had some 2,500 employees.

[12] 61 Stat. 193. See 16 Fed. Reg. 7630.

the public, was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively. It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty. That petitioner was not *required* by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.[13]

The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint, for as this Court has said of legislative privilege:

> "The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney* v. *Brandhove,* 341 U. S. 367, 377.

---

[13] Compare *United States* v. *Macdaniel,* 7 Pet. 1, 14; *United States* v. *Birdsall,* 233 U. S. 223, 230–231.

We are told that we should forbear from sanctioning any such rule of absolute privilege lest it open the door to wholesale oppression and abuses on the part of unscrupulous government officials. It is perhaps enough to say that fears of this sort have not been realized within the wide area of government where a judicially formulated absolute privilege of broad scope has long existed. It seems to us wholly chimerical to suggest that what hangs in the balance here is the maintenance of high standards of conduct among those in the public service. To be sure, as with any rule of law which attempts to reconcile fundamentally antagonistic social policies, there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good. And there are of course other sanctions than civil tort suits available to deter the executive official who may be prone to exercise his functions in an unworthy and irresponsible manner. We think that we should not be deterred from establishing the rule which we announce today by any such remote forebodings.

*Reversed.*

MR. JUSTICE BLACK, concurring.

I concur in the reversal of this judgment but briefly summarize my reasons because they are not altogether the same as those stated in the opinion of MR. JUSTICE HARLAN.

The petitioner Barr, while acting as Director of the Office of Rent Stabilization, a United States Government Agency, issued a press release in which he gave reasons why he intended to suspend the respondents Matteo and Madigan, who were also officers of the Agency. There is some indication in the record that there was an affirmative duty on Mr. Barr to give press releases like this, but however that may be it is clear that his action was forbidden neither by an Act of Congress nor by any governmental rule duly promulgated and in force. It is also clear that

the subject matter discussed in the release was germane to the proper functioning of the Rent Stabilization Agency and Mr. Barr's duties in relation to it. In fact, at the time the release was issued congressional inquiries were being made into the operations of the Agency and the controversy upon which the threatened suspensions were based, and the press release revealed that Barr had requested an opportunity to testify before a Congressional Committee with respect to the whole dispute.

The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees. Such an informed understanding depends, of course, on the freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important.

Mr. Barr was peculiarly well qualified to inform Congress and the public about the Rent Stabilization Agency. Subjecting him to libel suits for criticizing the way the Agency or its employees perform their duties would certainly act as a restraint upon him. So far as I am concerned, if federal employees are to be subjected to such restraints in reporting their views about how to run the government better, the restraint will have to be imposed expressly by Congress and not by the general libel laws of the States or of the District of Columbia.* How far the Congress itself could go in barring federal officials and employees from discussing public matters consistently with the First Amendment is a question we need not reach in this case. It is enough for me here that the press release was neither unauthorized nor plainly

---

*This case concerns District of Columbia law. In a companion case, *Howard* v. *Lyons*, *post*, p. 593, the Court rejects an attempt to hold a federal employee liable under the libel law of Massachusetts.

beyond the scope of Mr. Barr's official business, but instead related more or less to general matters committed by law to his control and supervision. See *Spalding* v. *Vilas,* 161 U. S. 483, 493, 498–499.

Mr. Chief Justice Warren, with whom Mr. Justice Douglas joins, dissenting.

The principal opinion in this case purports to launch the Court on a balancing process in order to reconcile the interest of the public in obtaining fearless executive performance and the interest of the individual in having redress for defamation. Even accepting for the moment that these are the proper interests to be balanced, the ultimate disposition is not the result of a balance. On the one hand, the principal opinion sets up a vague standard under which no government employee can tell with any certainty whether he will receive absolute immunity for his acts. On the other hand, it has not given even the slightest consideration to the interest of the individual who is defamed. It is a complete annihilation of his interest.

I could understand it—though I could not agree—if the Court adopted a broad absolute privilege for certain classes of government officials, or indeed for the entire executive, by broadly extending *Spalding* v. *Vilas,* 161 U. S. 483. At least that result would yield certainty by allowing government officials to know in advance whether they might issue absolutely privileged statements. But the opinion's test sets no standard to guide executive conduct. As the Government acknowledged on oral argument, Congress, when it creates executive agencies, almost never expressly authorizes the new agency to issue press releases as part of its functions. Nor does it decree which employees of the new agency will have such duties and which will not. By necessity, therefore, the decision will require a *de novo* appraisal of almost every charge of

defamation by a ,overnment official. The records will probably be no m ,re satisfactory than the one now before us—with little n ore than bald assertions that a specific official has the power to do what resulted in the defamation. The principal opinion cannot even say that Barr's position authorized the. press release; the most it can and does say is that it cannot say that the release was not an appropriate exercise of discretion by Barr in this precise situation, *ante,* p. 574. This creates a presumption that the challenged action is within the officer's scope of. duty unless the plaintiff can prove otherwise. Since it has been admitted that, as in this case, these duties are rarely enumerated, an executive assertion on the official's behalf may place an impossible burden of proof on the plaintiff seeking to avoid the defense of absolute privilege. By this unusual approach, the traditional rule that it is the defendant who must sustain his affirmative defense of privilege—and not the plaintiff who must negate that defense—is apparently disregarded.[1]

## I.

The history of the privileges conferred upon the three branches of Government is a story of uneven development. Absolute legislative privilege dates back to at least 1399.[2] This privilege is given to Congress in the United States Constitution[3] and to State Legislatures in the Constitutions of almost all of the States of the Union.[4] The abso-

---

[1] See, *e. g.,* Restatement, Torts, § 613, and Prosser, Torts (2d ed. 1955), 629 and cases cited.

[2] See Veeder, Absolute Immunity in Defamation: Legislative and Executive Proceedings, 10 Col. L. Rev. 131, 132. See also *Tenney* v. *Brandhove,* 341 U. S. 367, 372.

[3] U. S. Const., Art. I, § 6.

[4] See *Tenney* v. *Brandhove,* 341 U. S. 367, 375, n. 5.

However, this immunity has not been extended to inferior deliberative bodies. As to city councils, see, *e. g., Mills* v. *Denny,* 245 Iowa

lute immunity arising out of judicial proceedings existed at least as early as 1608 in England.[5]

But what of the executive privilege? Apparently, the earliest English case presenting the problem of immunity outside the legislative and judicial branches of government is *Sutton* v. *Johnstone*, 1 T. R. 493, decided in 1786. There, the plaintiff, captain of a warship, sued the commander-in-chief of his squadron for charging plaintiff, maliciously and without probable cause, with disobedience of orders and putting him under arrest and forcing him to face a court-martial. The Court of Exchequer took jurisdiction of the case but was reversed, 1 T. R. 510, on the ground that purely military matters were not within the cognizance of the civil courts.[6] Dur-

─────────

584, 63 N. W. 2d 222; *Greenwood* v. *Cobbey,* 26 Neb. 449, 42 N. W. 413; *Ivie* v. *Minton,* 75 Ore. 483, 147 P. 395; but cf. *Tanner* v. *Gault,* 20 Ohio App. 243, 153 N. E. 124. See also *Weber* v. *Lane,* 99 Mo. App. 69, 71 S. W. 1099 (board of aldermen); *Bradford* v. *Clark,* 90 Me. 298, 38 A. 229 (town meeting); *Smith* v. *Higgins,* 16 Gray (Mass.) 251 (town meeting).

[5] *Floyd* v. *Barker,* 12 Co. Rep. 23. See also *The King* v. *Skinner,* Lofft 55. An excellent history of the development of this privilege may be found in Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Col. L. Rev. 463. For the development of this privilege in the United States, see *Bradley* v. *Fisher,* 13 Wall. 335.

[6] This conclusion was justified on the following basis:

"Commanders, in a day of battle, must act upon delicate suspicions; upon the evidence of their own eye; they must give desperate commands; they must require instantaneous obedience. In case of a general misbehaviour, they may be forced to suspend several officers, and put others in their places.

"A military tribunal is capable of feeling all these circumstances, and understanding that the first, second, and third part of a soldier is obedience. But what condition will a commander be in, if, upon the exercising of his authority, he is liable to be tried by a common law judicature?

"The person unjustly accused is not without his remedy. He has the properest among military men. Reparation is done to him by

ing the next century several other military cases were decided.[7]

In *Chatterton* v. *Secretary of State for India,* [1895] 2 Q. B. 189, the defendant had been apprised that his action with respect to the plaintiff would be made the subject of a parliamentary inquiry. In the communication alleged to be libelous, the defendant told his Under Secretary what answer should be made if the question were asked him in Parliament. The court affirmed dismissal of the complaint relying on Fraser on The Law of Libel and Slander (1st ed.), p. 95, where the author, with no citations, observed, after relating the history of the military cases:

> "For reasons of public policy the same protection would, no doubt, be given to anything in the nature of an act of state, e. g., to every communication relating to state matters made by one minister to another, or to the Crown." [8]

---

an acquittal. And he who accused him unjustly is blasted for ever, and dismissed the service." 1 T. R., at 549–550.
The House of Lords affirmed. 1 Bro. P. C. 76.

[7] In *Home* v. *Bentinck,* 2 B. & B. 130 (1820), the court upheld a privilege asserted by the defendant against producing in court the document alleged to contain the libel. This effectively foreclosed the action. See also *Dickson* v. *The Earl of Wilton,* 1 F. & F. 419 (1859); *Keighly* v. *Bell,* 4 F. & F. 763 (1866); *Dawkins* v. *Lord F. Paulet,* L. R. 5 Q. B. 94 (1869); *Grant* v. *Secretary of State for India,* L. R. 2 C. P. D. 445 (1877). Though this last case was a suit against a civil officer, it arose out of a military situation.

[8] In 1895 the Secretary of State for India was an important figure in the Government and was a member of the Cabinet. The Statesman's Year-Book (1895) 10.

Throughout these years, suits were brought against members of the executive branches of the British Government but were dismissed on the theory that the officer had acted solely as an agent for the Government and therefore was not personally liable. *E. g., Macbeath* v. *Haldimand,* 1 T. R. 172 (1786); *Gidley* v. *Lord Palmerston,* 3 B. & B. 275 (1822).

This was the actual birth of executive privilege in England.

Such was the state of English law when, the next year, this Court decided *Spalding* v. *Vilas, supra.* In granting the Postmaster General absolute immunity for "matters committed by law to his control or supervision," this Court relied exclusively on the judicial privilege cases and the English military cases. Thus, leaving aside the military cases, which are unique, the executive privilege in defamation actions would appear to be a judicial creature of less than 65 years' existence. Yet, without statute, this relatively new privilege is being extended to open the possibility of absolute privilege for innumerable government officials.

It may be assumed, *arguendo*, that a government employee should have absolute immunity when according to his duty he makes internal reports to his superior or to another upon his superior's order. Cf. *Taylor* v. *Glotfelty*, 201 F. 2d 51; *Farr* v. *Valentine*, 38 App. D. C. 413; *DeArnaud* v. *Ainsworth*, 24 App. D. C. 167. This might be a practical necessity of government that would find its justification in the need for a free flow of information within every executive department. It may not be unreasonable to assume that if a maliciously false libel is uttered in an internal report, it will be recognized as such and discredited without further dissemination.

*Spalding* v. *Vilas, supra*, presents another situation in which absolute privilege may be justified. There the Court was dealing with the Postmaster General—a Cabinet officer personally responsible to the President of the United States for the operation of one of the major departments of government. Cf. *Glass* v. *Ickes*, 73 App. D. C. 3, 117 F. 2d 273; *Mellon* v. *Brewer*, 57 App. D. C. 126, 18 F. 2d 168. The importance of their positions in government as policymakers for the Chief Executive and the fact that they have the expressed trust and

confidence of the President who appointed them and to whom they are personally and directly responsible suggest that the absolute protection partakes of presidential immunity. Perhaps the *Spalding* v. *Vilas* rationale would require the extension of such absolute immunity to other government officials who are appointed by the President and are directly responsible to him in policy matters even though they do not hold Cabinet positions.[9] But this extension is not now before us, since it is clear that petitioner Barr was not appointed by the President nor was he directly responsible to the President. Barr was exercising powers originally delegated by the President to the Director of Economic Stabilization who redelegated them to the Director of Rent Stabilization.[10] And it is not contended that petitioner was under any order to issue a statement in this matter.

I would not extend *Spalding* v. *Vilas* to cover public statements of lesser officials. Releases to the public from the executive branch of government imply far greater dangers to the individual claiming to have been defamed than do internal libels. First, of course, a public statement—especially one arguably libelous—is normally in-

---

[9] This might well, for example, include Barr's superior in 1953—the Director of Economic Stabilization.

[10] Barr's position as Deputy Director was such, on the date of the libel, that he recognized that he was not then entitled to suspend or fire the respondents and could not do so until several days later. (The Government asserted on oral argument that the full powers of the Director would devolve upon anyone who—by virtue of his superiors' leaving town—was in fact the highest ranking member of the agency at the moment. It was in this light that Barr was "Acting" Director on the date of the libel.) Even after Barr officially became Acting Director on February 9, 1953, the Government admitted that the Director of Economic Stabilization "could have" directed Barr either to make or not to make press releases. When Barr took action against respondents, they appealed the decision to the Director of Economic Stabilization and ultimately were reinstated.

tended for and reaches a larger audience than an internally communicated report. Even if the release can later be shown libelous, it is most unusual for a libeled person to obtain the same hearing that was available for the original press release. Second, a release is communicated to a public in no position to evaluate its accuracy; where the report is made internally, the superior is usually in a position to do so. If the report is false, the superior can undo much of the harm of the report by countermanding it or halting its spread.

Giving officials below cabinet or equivalent rank qualified privilege for statements to the public would in no way hamper the internal operation of the executive department of government, nor would it unduly subordinate the interest of the individual in obtaining redress for the public defamation uttered against him. Cf. *Colpoys* v. *Gates,* 73 App. D. C. 193, 118 F. 2d 16.

## II.

The foregoing discussion accepted for the purpose of argument the majority's statement of the interests involved here. But as so often happens in balancing cases, the wrong interests are being balanced. Cf. *Barenblatt* v. *United States, ante,* p. 134 (dissenting opinion). This is not a case where the only interest is in plaintiff's obtaining redress of a wrong. The public interest in limiting libel suits against officers in order that the public might be adequately informed is paralleled by another interest of equal importance: that of preserving the opportunity to criticize the administration of our Government and the action of its officials without being subjected to unfair—and absolutely privileged—retorts. If it is important to permit government officials absolute freedom to say anything they wish in the name of public information, it is at least as important to preserve and

foster public discussion concerning our Government and its operation.

It is clear that public discussion of the action of the Government and its officials is accorded no more than qualified privilege. In most States, even that privilege is further restricted to situations in which the speaker is accurate as to his facts and where the claimed defamation results from conclusions or opinions based on those facts. Only in a minority of States is a public critic of Government even qualifiedly privileged where his facts are wrong.[11] Thus, at best, a public critic of the Government has a qualified privilege. Yet here the Court has given some amorphous group of officials—who have the most direct and personal contact with the public—an absolute privilege when their agency or their action is criticized. In this situation, it will take a brave person to criticize government officials knowing that in reply they may libel him with immunity in the name of defending the agency and their own position. This extension of *Spalding* v. *Vilas* can only have the added effect of deterring the desirable public discussion of all aspects of our Government and the conduct of its officials. It will sanctify the powerful and silence debate. This is a much more serious danger than the possibility that a government official might occasionally be called upon to defend his actions and to respond in damages for a malicious defamation.

## III.

The principal opinion, while attempting to balance what it thinks are the factors to be weighed, has not effectuated the goal for which it originally strove.

---

[11] An extensive compilation of which States adhere to each view may be found in Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 896–897, n. 102–106.

Rather, its result has been an uncertain standard whose effect can unfold only on a case-to-case basis, and which does not provide a guide for executive conduct. But more important, the opinion has set out the wrong interests and by its extension of absolute privilege in this case has seriously weakened another great public interest—honest and open discussion and criticism of our Government.

I would affirm.

Mr. Justice Brennan, dissenting.

I think it is demonstrable that the solution of Mr. Justice Harlan's opinion to the question whether an absolute privilege should be allowed in these cases is not justified by the considerations offered to support it, and unnecessarily deprives the individual citizen of all redress against malicious defamation. Surely the opinion must recognize the existence of the deep-rooted policy of the common law generally to provide redress against defamation. But the opinion in sweeping terms extinguishes that remedy, if the defamation is committed by a federal official, by erecting the barrier of an absolute privilege. In my view, only a qualified privilege is necessary here, and that is all I would afford the officials. A qualified privilege would be the most the law would allow private citizens under comparable circumstances.[1] It would protect the government officer unless it appeared on trial that his communication was (a) defamatory, (b) untrue, and (c) "malicious."[2] We write on almost a clean slate here,

---

[1] Prosser, Torts (2d ed. 1955), § 95.

[2] Actual "malice" is required to vitiate a qualified privilege, not simply the "constructive" malice that is inferred from the publication. See Harper and James, Torts (1956), § 5.27. Definitions of actual

and even if *Spalding* v. *Vilas*, 161 U. S. 483, allows a Cabinet officer the defense of an absolute privilege in defamation suits,[3] I see no warrant for extending its doctrine to the extent done—apparently to include every official having some color of discretion to utter communications to Congress or the public. As Judge Magruder pointed out below, 250 F. 2d 912, 915, present applications of the doctrine of absolute privilege of public officials are narrowly confined,[4] and I think in the light of the considerations involved very rightly so. But MR. JUSTICE HARLAN'S approach seems to clothe with immunity the most obscure subforeman on an arsenal production line who has been delegated authority to hire and fire and who maliciously defames one he discharges.

---

"malice" are essayed in Prosser, Torts (2d ed. 1955), pp. 625–629; Harper and James, Torts (1956), §5.27. See Restatement, Torts, §§ 599–605.

[3] The suit in *Spalding* seems to have been as much, if not more, a suit for malicious interference with advantageous relationships as a libel suit. The Court reviewed the facts and found no false statement. See 161 U. S., at 487–493. The case may stand for no more than the proposition that where a Cabinet officer publishes a statement, not factually inaccurate, relating to a matter within his Department's competence, he cannot be charged with improper motives in publication. The Court's opinion leaned heavily on the fact that the contents of the statement (which were not on their face defamatory) were quite accurate, in support of its conclusion that publishing the statement was within the officer's discretion, foreclosing inquiry into his motives. *Id.*, at 489–493. Different considerations suggest themselves where a statement is defamatory and untrue; it is one thing to say that public officers must answer as to their motives for any official action adversely affecting private interests and another that they must as to the publication of defamatory, untrue matter.

[4] The opinion's rationale covers the entire federal bureaucracy, as compared to the numerically much less extensive legislative and judicial privileges. And as to the former, the Constitution speaks, and the resolution of the factors involved in the latter is very obviously within the courts' special competence.

A qualified privilege, as I have described, would, in giving the official protection against the consequences of his honest mistakes, give him all the protection he could properly claim. As is quoted, if that were all that there were ʟto the matter, it would be indeed "monstrous" to grant the absolute defense and preclude all examination of the matter at the suit of a citizen claiming legal injury. But what more is involved? The opinion's position is simply that there are certain societal interests in relieving federal officials from judicial inquiry into their motives that outweigh all interest in affording relief. There is adopted Judge Learned Hand's statement of this added factor that is said to make an absolute privilege imperative: "it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581. In the first place, Professors Harper and James have, I think, squarely met and refuted that argument on its own terms: "Where the charge is one of honest mistake we exempt the officer because we deem that an *actual holding of liability* would have worse consequences than *the possibility of an actual mistake* (which under the circumstances we are willing to condone). But it is stretching the argument pretty far to say that the *mere inquiry into malice* would have worse consequences than the *possibility of actual malice* (which we would not, for a minute, condone). Since the danger that official power will be abused is greatest where motives are improper, the balance here may well swing the other way." Harper and James, Torts (1956), p. 1645. And in the second place, the courts should be wary of any argument based on the fear that subjecting government

officers to the nuisance of litigation and the uncertainties of its outcome may put an undue burden on the conduct of the public business. Such a burden is hardly one peculiar to public officers; citizens generally go through life subject to the risk that they may, though in the right, be subject to litigation and the possibility of a miscarriage of justice. It is one of the goals of a well-operating legal system to keep the burden of litigation and the risks of such miscarriages to a minimum; in this area, which is governed by federal law, proof of malice outside of the bare fact of the making of the statement should be forthcoming,[5] and summary judgment practice offers protection to the defendant; but the way to minimizing the burdens of litigation does not generally lie through the abolition of a right of redress for an admitted wrong. The method has too much of the flavor of throwing out the baby with the bath—today's sweeping solution insures that government officials of high and low rank will not be involved in litigation over their allegedly defamatory statements, but it achieves this at the cost of letting the citizen who is defamed even with the worst motives go without remedy.

There is an even more basic objection to the opinion. It deals with large concepts of public policy and purports to balance the societal interests involved in them. It denies the defamed citizen a recovery by characterizing the policy favoring absolute immunity as "an expression of a policy designed to aid in the effective functioning of government." The explanation is said to be that it is "important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the

---

[5] See note 2, *supra*.

fearless, vigorous, and effective administration of policies of government." This, I fear, is a gossamer web self-spun without a scintilla of support to which one can point. To come to this conclusion, and to shift the line from the already extensive protection given the public officer by the qualified privilege doctrine, demands the resolution of large imponderables which one might have thought would be better the business of the Legislative Branch. To what extent is it in the public interest that the Executive Branch carry on publicity campaigns in relation to its activities? (Without reviewing all the history, one can say this is a matter on which Congress and the Executive have not always seen eye to eye. See 38 Stat. 212, 5 U. S. C. § 54.) To what extent does fear of litigation actually inhibit the conduct of officers in carrying out the public business? To what extent should it? Where does healthy administrative frankness and boldness shade into bureaucratic tyranny? To what extent is supervision by an administrator's superiors effective in assuring that there will be little abuse of a freedom from suit? To what extent can the referral of constituent complaints by Congressmen to the executive agencies (already myriad in number and quite routinized in processing) take the place of actions in the courts of law in securing the injured citizen redress? Can it be assumed, as the opinion appears to assume, that an absolute privilege so broadly enjoyed will not be subject to severe abuse? Does recent history afford instructive parallels in the experience with constitutionally recognized forms of governmental privilege—say the legislative privilege? I do not purport to know the answers to these questions, and I simply submit that the nature of the questions themselves should lead us to forsake any effort on our own to modify over so wide an area the line the common law generally indicates is to be drawn here. This is particularly so in an area not

foreclosed by our previous cases, and one combining the maximum exposure of the citizen's reputation with the most attenuated of interests in the operation of the Government.

The courts, it must be remembered, are not the only agency for fashioning policy here. One would think, in fact, if the solution afforded through a qualified privilege (which would apply between private parties under analogous circumstances) [6] were to be modified on the strength of considerations such as those discussed today, that Congress would provide a more appropriate forum for the determination. The presence of the imponderables I have discussed, their political flavor, and their intimate relation to the practicalities of government management would support this conclusion. If the fears expressed materialized and great inconvenience to the workings of the Government arose out of allowing defamation actions subject to a showing of malice, Congress might well be disposed to intervene. And its intervention might take a less drastic form than the solution today. Pursuant to an Act of Congress, the inconvenience to the government officials made defendants in these suits has been alleviated through the participation of the Department of Justice. Rev. Stat. § 359, as amended, 5 U. S. C. § 309; *Booth* v. *Fletcher,* 69 App. D. C. 351, 101 F. 2d 676. Congress might be disposed to intervene further and pay the judgments rendered against executive officers, or provide for a Tort Claims Act amendment to encompass such actions,[7] eliminating the officer as a formal party. --We ought not, as I fear we do today, for all practical purposes foreclose such consideration of the problem by expanding on the comparable common-law

---

[6] See the opinion of the court below in No. 350, 103 U. S. App. D. C. 176, 177, 256 F. 2d 890, 891.

[7] They presently are excluded. 28 U. S. C. § 2680 (h).

privilege and wholly immunizing federal officials from defamation suits whenever they can show that their act was incidental to their jobs.[8]

Mr. Justice Stewart, dissenting.

My brother Harlan's opinion contains, it seems to me, a lucid and persuasive analysis of the principles that should guide decision in this troublesome area of law. Where I part company is in the application of these principles to the facts of the present case.

I cannot agree that the issuance by the petitioner of this press release was "action in the line of duty." The statement to the press (set out in note 5 of Mr. Justice Harlan's opinion) did not serve to further any agency function. Instead, it represented a personally motivated effort on the petitioner's part to disassociate himself from the alleged chicanery with which the agency had been charged.

By publicizing the action which he intended to take when he became permanent Acting Director, and his past attitude as a lesser functionary, the petitioner was seeking only to defend his own individual reputation. This was not within, but beyond "the outer perimeter of petitioner's line of duty."

---

[8] There is controversy as to whether it was mandatory upon petitioner in No. 57 to make his report to the Congressmen. It is not contended that it was mandatory for him to use the words he did, and only if this were so, under my approach, could there possibly be an absolute defense. See *Farmers Educational & Cooperative Union* v. *WDAY, Inc., ante,* pp. 525, 531.