Albert R. BELL, Appellant,

v.

Charles WOLFF, Jr., Appellee.

No. 73-1898.

United States Court of Appeals,
Eighth Circuit.

Submitted April 18, 1974.

Decided May 17, 1974.

Terrence J. Ferguson, Legal Aid Society of Omaha, Robert V. Broom, R. Ladd Lonnquist, Omaha, Neb., Robert S. Catz, Washington, D. C., for appellant.

Mel Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

TALBOT SMITH, Senior District Judge.

Plaintiff Albert R. Bell appeals from the denial by the court below, after trial to the court, of an award of damages in his civil rights action[1] against Charles Wolff, Jr., Warden of the Nebraska Penal and Correctional Complex. The plaintiff's principal complaint, which was sustained by the district court, was that he had been subjected to involuntary servitude in violation of the Thirteenth Amendment when, as a pretrial detainee incarcerated in the Penal Complex, he was compelled by the Warden to work without compensation. Damages were not awarded for this and other violations of plaintiff's constitutional rights, however, because of the court's finding that the Warden had acted in good faith throughout.

 Two principal issues are urged to us on appeal, first that the trial court erred in finding that the Warden acted in good faith and within the scope of his

---

*TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. Action was brought pursuant to 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

authority as Warden[2] and, second, that the trial court erred in its allocation of the burden of proof as to good faith. We will consider these issues seriatim. It is pertinent to note at the outset that the measure, scope, and application of an asserted immunity under § 1983, arising, as it does, under a federally created cause of action, cannot be restricted or enlarged by state laws concerning official privilege or immunity. As was held by Judge (now Justice) Stewart in Nelson v. Knox, 256 F.2d 312, 314 (6th Cir. 1958)

> [T]he extent of the defendants' insulation from liability under the Civil Rights Act cannot properly be determined by reference to the local rule in Michigan. Surely each state cannot be left to decide for itself which of its officials are completely immune from liability for depriving a citizen of rights granted by the Federal Constitution. The question must be decided as a matter of general law.[3]

Plaintiff Bell was admitted to the Penal Complex on April 7, 1972 pursuant to a court order obtained by Douglas County, Nebraska officials who had been holding him in the county jail pending his extradition to Oklahoma. The order states as a reason for the transfer that the plaintiff posed a security risk to the local jail. At the time of Bell's admission defendant had been Warden for less than nine months; prison policies were undergoing re-evaluation and many were in a state of transition. The Complex received few prisoners in plaintiff's classification[4] and no special facilities were available for them. The ordinary procedure was to place "Safekeepers" in "administrative segregation": they would be locked up in a wing of the prison called the "Adjustment Center" and not allowed to mingle with the general population or participate in the programs (including work) available to the convicts.[5] Warden Wolff interviewed plaintiff upon his admission to the Complex. He was then aware that Bell was an unconvicted "safekeeper"; he also had read the "Confidential Report for Transporting Officer," a document prepared by Warden Terry of the Douglas County Jail, which indicated that plaintiff was a troublemaker and a "show off." Part of the purpose of the interview was to determine whether plaintiff's reputation as a troublemaker was justified. As noted, the Warden was reevaluating the procedures and policies of the institution and was concerned as to whether it was "necessary to confine a 22 year old man to administrative segregation as a safekeeper." Accordingly, he offered to permit the plaintiff to take the course normally followed by convicted inmates, that is, assignment to the "Reception and Diagnostic Center" for evaluation and ultimate assignment for work in the general population. Bell was told, however, that he probably would not be paid for his work. Plain-

---

2. See Scheuer v. Rhodes, 42 U.S.L.W. 4543, 4548, —— U.S. ——, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974) which states that the scope of the immunity of a member of the executive branch is commensurate with "the scope of discretion and responsibilities of [his] office. . . . It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct."

3. See also Jobson v. Henne, 355 F.2d 129, 133 (2nd Cir. 1966), where it is pointed out that the purpose of § 1983 "is to provide a federal remedy for the deprivation of federally guaranteed rights in order to enforce more perfectly federal limitations on unconstitutional state action."

4. Bell was what is described in the record as a "pretrial detainee", lodged under state authority for safekeeping only.

5. Under examination by the court the Warden stated he would like to have had a separate facility designed for unsentenced inmates "to house these people segregated from population not being involved in a punitive type approach." Administrative segregation was used, "lacking other alternatives . . . as your routine method because essentially this service is provided the local jurisdiction merely as a holding situation. They are . . . neither brought to us for rehabilitation or programming."

tiff accepted the offer and was sent to the reception center where he remained for about a month without incident.

His evaluation complete, Bell was brought before the Initial Classification Committee, chaired by the Warden, to be informed of his "live-in location and work assignment." Again told that he would not be paid for his work, plaintiff became belligerent and had to be physically removed to confinement. He was placed in punitive segregation for this outburst, and there remained for two weeks. Before the classification committee a second time, on May 23, 1972 he signed a document "requesting the authorities of this institution to let me do some kind of work while at this institution, in order that I will not have to remain confined all day long," and agreed to work without pay. He was assigned to the general population and worked satisfactorily without pay in one of the institution's furniture shops until July 11, 1972. On this day he was placed in punitive segregation for refusal to obey a work order and there remained until shortly before his release from the Penal Complex on July 30, 1972.

The Warden explained his refusal to pay safekeepers as based on a lack of money budgeted for that purpose and on "the general policy . . . that since the individual was not a felon, was not entitled to good time or statutory time credits, would not be entitled to be paid for work, and of course, for many years they were not working. They were merely held in a safekeeping status, and were not released from that status while they were there. It is only through these last few years that we have even tried at something a little more toward the area of programming on a safekeeper." In other words, he was trying something new and wasn't quite sure he had the authority or the funds to pay

Bell;[6] he conceived of the plan as a progressive step, available to safekeepers on a volunteer basis, to relieve them of the rigors of being "confined all day long" in administrative segregation.

The trial court found, however, that plaintiff was not a true volunteer. In a conclusion unchallenged by defendant, it was held that plaintiff had been subjected to involuntary servitude because his signing of the request to work form did not possess sufficient voluntariness to make it constitutionally acceptable. The alternative presented to Bell was to be confined in administrative segregation under conditions which, the court found, violated his constitutional rights to liberty and free speech and association in that he would have been subject to the same regulations governing personal grooming, mail and visitation as convicted inmates, and these regulations were not reasonably necessary to effect the security of Bell's confinement, the only permissible goal of pretrial detention.

■ The violations, then, are conceded, but the crux of the case with respect to the damage remedy here sought is whether the trial court erred in finding that the Warden acted in good faith. Upon careful examination of the entire record we find no error in such finding. Plaintiff's suggestion that the Warden acted out of personal animus towards him is unfounded. With reference to petitioner's charge that the Warden had forced him to work, the trial court found, and the record supports, that as a result of the Warden's conference with the petitioner, the Warden reasonably believed that the petitioner wished to work rather than to remain idle. We agree as well with the trial court that, measured by objective standards, it is clear "that the work program for pretrial detainees was conceived as a progressive step [toward the] humane treatment of those

---

**6.** The Warden testified that subsequent to these events "[we] asked for an increase in that particular account without justifying what the increase was for. We received the money. And now if an individual comes in that is a safekeeper, if he works he gets paid the same as any other man working in a comparable job." Convicts are paid thirty-five cents to a dollar a day for their labor.

forced to remain in jail while awaiting trial". Morever, the trial court found that "the defendant since his appointment as warden . . . has sought to alter prison life in accord with progressive court decisions and the best advice of his professional colleagues." We note, as well, the then absence of authoritative judicial or legislative guidance with respect to the treatment of "safekeepers" lodged in the prison complex for reasons of security. The short of it is that the trial court found the defendant to be conscientiously attempting to effect a progressive administration with the facilities and funds available to him, and the steps taken by him in the furtherance of this objective though, as the trial court found, offensive constitutionally, were undertaken in good faith.

As noted, the parties seek to present the issue of which party has the burden of proving good faith, that is, whether it is a defense to be pleaded and proved by him who asserts it, or whether, as defendant asserts, "the presumption that an officer is properly carrying out his duty must be rebutted by plaintiff, proving bad faith." We need not explore this problem, if, indeed, it is a problem [7] in view of the fact that after taking extensive testimony from both the plaintiff and the Warden the trial court made a positive finding that "[t]here simply is not a scintilla of evidence of lack of good faith on the part of the defendant." In this posture of the case any discussion by us of the burden of proof would be purely academic.

The findings and judgment of the court below are affirmed.

---

7. "The law of privilege as a defense by officers of government to civil damage suits for defamation and kindred torts has in large part been of judicial making * * * ", Barr v. Matteo, 360 U.S. 564, 569, 79 S.Ct. 1335, 1338, 3 L.Ed.2d 1434 (1959). The holding in Strickland v. Inlow, 485 F.2d 186 (8th Cir. 1973), cert. granted 42 U.S.L.W. 3584, —— U.S. ——, 94 S.Ct. 1932, 40 L.Ed.2d 285 (1974), as respects malice, went to the negation of a requirement of such specific intent for the recovery of compensatory damages, not to burden of proof.

With respect to the inter-relation between the traditional doctrine of official privilege, and immunity under the provisions of the Civil Rights Act, see Jobson v. Henne, 355 F.2d 129 (2nd Cir. 1966) and Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3364 (U.S. Nov. 19, 1973) (No. 73–801) and cases and articles therein cited. Cf. Wilhelm v. Turner, 431 F.2d 177 (8th Cir. 1970).