GILLIARD MATHURIN, Plaintiff

v.

GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

Civil No. 97-1973

GILBERT SAMPSON, Plaintiff

v.

GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

Civil No. 98-1973

WALCOTT STEELE, Plaintiff

v.

GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

Civil No. 99-1973

District Court of the Virgin Islands

Div. of St. Croix

June 20, 1975

24

EDWARD J. OCEAN, ESQ., Christiansted, St. Croix, V.I., *for plaintiffs*

DANIEL C. LEARNED, ESQ., St. Thomas, V.I., *for defendant*

YOUNG, *District Judge*

### MEMORANDUM OPINION AND JUDGMENT

Each of the three above named plaintiffs filed his action under the Tort Claims Act against the Government of the Virgin Islands and against six named police officers* claiming $175,000.00 punitive and general damages, "jointly and severally against all defendants" to compensate them for beatings allegedly inflicted upon them by several police officers, employees of the Department of Public Safety. The circumstances which have culminated in this suit for personal injuries arose out of the kidnapping and brutal murder of an eight-year-old girl, Maria Felix, for which the three plaintiffs herein were twice tried. In the late evening of February 21, 1971, plaintiffs Gilliard Mathurin, Gilbert Sampson and Walcott Steele were separately apprehended by officers of the Department of Public Safety as part of the investigation of the Maria Felix case. A jury trial was conducted on April 20, 21, 22, 23 and 24, 1971, following which plaintiffs herein were found guilty of murder in the second degree (Count I) and kidnapping (Count II). Judge Christian then imposed a sentence of thirty-five (35) years on Count I and twenty (20) years on Count II, said

---

* The individually named police officers were dismissed from the action upon motions of plaintiffs just prior to the court trial of all issues as to the remaining defendant, the Government of the Virgin Islands.

sentences to run concurrently. After a notice of appeal had been filed to the Third Circuit, the plaintiffs herein directed a motion to Judge Christian, requesting a new trial on the grounds of newly discovered evidence. Following a hearing on the issue of new evidence held on November 5, 1971, the motion was granted and a new trial ordered.

Due to the conspicuous conflict between the evidence presented at the first trial and that adduced at the subsequent hearing for a new trial, the Government requested that the three defendants (plaintiffs herein), along with several police officers involved in the case, undergo the administration of a polygraph test. On the basis of the results of the tests, the Government decided not to dismiss the charges against the individuals and proceeded with a second trial. More than one year later, on November 21, 22, 24, 25 and 27, 1972, plaintiffs herein were retried and acquitted on all counts.

The instant action focuses on the incidents surrounding the initial apprehension and subsequent interrogation of Mathurin, Sampson and Steele during the late evening, early morning hours of February 21–22, 1971. The Richmond Penitentiary log reveals that Steele and Sampson were brought to that institution at 10:45 p.m. on February 21 and 12:45 a.m. on February 22, respectively. Testimony of several prison guards and officers indicated that upon their initial admittance to Richmond, the two appeared to be in good physical condition and showed no signs of external injury. At 3:25 a.m., on February 22, according to subsequent notations in the prison log, Officers Navarro and Rivera came to the prison and accompanied Steele and Sampson to police headquarters in Christiansted, St. Croix. Mathurin, apparently, was taken directly to police headquarters following his arrest. The three prisoners were not returned to Richmond Peniten-

tiary until approximately 1:15 the following afternoon; at that time the log reflected that "Steele had a swollen jaw, Sampson busted mouth". Several hours later, the three men were taken before Municipal Court Judge Antoine L. Joseph for advisement of rights and the preliminary setting of bail. Judge Joseph thereupon ordered that the prisoners be taken directly to the hospital for examination and treatment. An examination of the three ensued at the Charles Harwood Memorial Hospital at 6:15 p.m., revealing a number of superficial injuries on the faces and upper torsos of the three individuals.

The plaintiffs' account of their station house confrontation with various named police officers on the morning of February 22 propounds a tale of brutality which, if believed, goes far beyond any claim of zealous police work. Without dwelling at great length on the seemingly countless allegations of police maltreatment on that morning, I feel compelled to set forth some of the acts as related by the plaintiffs. They alleged, inter alia, that they were continuously beaten with fists, clubs, blackjacks and a plywood board; that while two officers inserted their revolvers in each of his ears, plaintiff Mathurin was tortured by having paper stuffed in his mouth and then burned, resulting in burns to his face and hair; that plaintiff Sampson was hung from a balcony under the threat of being dropped to the street below if he did not cooperate; that plaintiff Sampson was pushed down a stairway three times while handcuffed.

Following the presentation of the plaintiffs' case, the Government rested, thereby permitting plaintiffs' version of the police station encounter to remain essentially uncontroverted in the record. As part of his closing statement at trial, counsel for the Government submitted to the Court a "Summation Brief", which argues that the aforementioned conduct on the part of its employees was

of such an outrageous or aggravated nature as to be outside the scope of their employment.

# I

## LIABILITY OF THE INDIVIDUAL POLICE OFFICERS

On March 10, 1975, a stipulation for dismissal with prejudice was signed by counsel for plaintiffs and counsel for the individual police officers in this action. Although that stipulation renders the following discussion somewhat moot insofar as this particular action is concerned, a reconsideration of the Virgin Islands immunity law as it relates to governmental officials and employees will be undertaken at this point.

The local Tort Claims Act, upon which plaintiffs' claims against the Government are based, provides that:

> [T]he Government of the Virgin Islands hereby waives its immunity from liability and action and hereby assumes liability with respect to injury or death *caused by the negligent or wrongful act or omission of an employee of the Government of the Virgin Islands while acting within the scope of his office or employment,* if a private person would be liable to the claimant in accordance in the law of the place where the act or omission occurred.

33 V.I.C. § 3408 (emphasis added). Section 3408 constitutes an important diminution of the sweeping immunity afforded to the Virgin Islands Government by the Revised Organic Act of 1954. Section 2(b) of the 1954 Act states "[t]hat no tort action shall be brought against the Government of the Virgin Islands or against any officer or employee thereof in his official capacity without the consent of the legislature constituted by this Act." Decisional authority in this jurisdiction has consistently held that although the Legislature in its promulgation of the Tort Claims Act clearly intended to waive sovereign immunity as to the Government itself, the official immunity of its employees nonetheless remains. See, e.g., Spisso

28

v. Tonkin, 2 St.XSupp. 502, 503 (D.C.V.I. Sept. 7, 1973); George v. Government of the Virgin Islands, Civ. No. 498-1973 (D.C.V.I. filed Jan. 23, 1975). Read together, Section 2(b) of the Revised Organic Act and 33 V.I.C. § 3408 suggest an unfortunate "either/or" situation in which a potential litigant cannot recover against both the Government and its servants arising out of a single wrong. For, a governmental employee is deprived of official immunity if, and only if, his actions are found to be outside the scope of his employment; and the Government is held liable for the acts of its employees, if, and only if, the latter are acting within the scope of their employment. What remains, then, is a mutually exclusive system of government/employee liability founded upon a waiver by the Virgin Islands of its immunity as a governmental entity and a continuance of said immunity as to its employees.

The flaw in the foregoing framework lies not so much with the waiver of governmental immunity afforded by the Tort Claims Act as with the virtual blanket immunity granted to all governmental employees by the 1954 Organic Act. To extend the protective aegis of the immunity doctrine to *all* acts of *all* governmental employees, which protection is forfeited only as to those limited number of acts which fall outside the scope of employment, is to ignore the policy considerations underlying the doctrine. The classical justification for the doctrine of official immunity is found in the nineteenth century Supreme Court opinion of Spaulding v. Vilas, 161 U.S. 483 (1896):

In exercising the functions of his office the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch

29

of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals.

Id. at 409–99, quoted in Barr v. Matteo, 360 U.S. 564, 570 (1959).

Although the privilege outlined in the foregoing passage from the Spalding case has not been restricted to officers in the upper eschelons of the executive hierarchy (see Barr v. Matteo, supra. at 572–74), it nonetheless requires that in order for immunity to adhere to a given act, the official or lower-ranking employee must have performed "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." Id. at 575. However difficult a case-by-case application of the discretionary/ministerial dichotomy may prove to be, that distinction must be read into Section 2(b) of the Organic Act in order to give credence to the historical justification for the immunity doctrine. A rule which purports to shield all governmental employees from liability for their transgressions merely on a showing that said acts were done in their official capacity creates immunity not only for the department head who makes an erroneous policy decision, but also the sanitation truck driver who negligently misses a stop sign and injures a pedestrian. To afford the latter governmental immunity clearly constitutes an aberrational application of the doctrine.

Simon v. Lovgren, 10 V.I. 302, 2 St.XSupp. 593 (D.C.V.I. 1973), a recent decision rendered by this Court, aptly illustrates the inequities inherent in a literal interpretation of Section 2(b). In that case, plaintiff sought

damages against both the Government and a police officer in his individual capacity, alleging that on a certain morning, the officer kicked in the door to her home, committed an assault and battery upon her, threatened to arrange her deportation, and verbally abused her in the presence of other persons. This Court dismissed the complaint against the police officer in his individual capacity, on the ground that the complaint acknowledged that "Lovgren . . . at all times herein mentioned was acting within the scope of his employment and in the capacity of a police officer." Id. at 594.

The substantial body of precedent that deals with the issue of whether or not police officers performing police duties warrant the protection of the immunity defense does so in terms of the discretionary/ministerial distinction heretofore discussed. A police officer undoubtedly exercises a great deal of discretion in his day-to-day activities as a law enforcement official. However, "the fiction that [a police officer's actions are] not discretionary is maintained because of the belief that the benefit to society derived from the protection of personal liberties outweighs the detriment of perhaps deterring vigorous police action." Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1346 (2d Cir. 1972); Cashen v. Spann, 311 A.2d 192, 200 (N.J. 1973); Jones v. State, 307 N.E.2d 236, 241 (N.Y. Ct. App. 1973) (dissent). Correspondingly, the common law has never recognized an absolute or unqualified grant of immunity to police officers. Piersen v. Ray, 386 U.S. 547, 555 (1967); Bivens, supra. at 1346.

The Bivens Court, in enunciating the policy behind the common law rule, sounds as if it had the instant case in mind:

We believe the long line of cases culminating in Weeks v. United States . . . and Mapp v. Ohio . . . indicates a woeful laxity on the part of some police officers, state and federal, in complying with constitu-

31

tional standards, and this laxity would be encouraged by a grant of immunity . . . . It would be a sorry state of affairs if an officer had the 'discretion' to enter a dwelling at 6:30 a.m., without a warrant or probable cause, and make an arrest by employing unreasonable force.

Id. at 1346 (citations omitted).

To this statement, I need only add that it would be an even sorrier state of affairs if officers of the Virgin Islands Department of Public Safety had the "discretion" to maltreat suspects with impunity. I, therefore, find that the governmental immunity afforded by the Organic Act would not have been available to the individual police officers in this action, had the suit against them not been dismissed with prejudice.

## II

### GOVERNMENT'S LIABILITY

As heretofore acknowledged, the Government's liability is dependent upon whether the police officers were acting within the scope of their employment when they inflicted bodily injuries upon the plaintiffs. Upon that narrow determination, the remainder of the liability portion of these findings will focus.

Fully cognizable of the broad construction given the term "within the scope of employment" in the context of various federal statutes [see e.g., Barr v. Matteo, supra. at 575; Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949); contra, see Hughes v. Johnson, 305 F.2d 67, 70 (9th Cir. 1962); Kelley v. Dunne, 344 F.2d 129, 134 (1st Cir. 1965)], I am nonetheless bound, in an action based on the Virgin Islands Tort Claims Act, by the local law of respondent superior as set forth in the Restatement (Second) of Agency. Section 245 of the Restatement appears to establish a test of expectability or foreseeability in the case of the intentional use of force by a servant:

32.

A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, *if the act was not unexpectable in view of the duties of the servant.* (Emphasis added.)

See also Guillen v. Kuykendall, 470 F.2d 745, 747 (5th Cir. 1972); Adami v. Dobie, 440 S.W.2d 330, 334 (Tex. Cir. App. 1069); Henderson v. Laclede Radio, Inc., 506 S.W.2d 434, 436 (Mo. 1974). Comment c. following Section 245 indicates that in order "[t]o create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring the servant into conflict with others." Undoubtedly, employment as a law enforcement officer falls within the prescription; from this starting point, I believe that the Government has a very difficult burden to overcome in its attempt to establish that the conduct of the officers was unforeseeable. The Government's position, as I read it, is that the overall nature of the employment is not conclusive, but pertinent only insofar as it relates to the expectability or foreseeability of the *individual act* complained of. The argument continues that even though a given employment might be one which could foreseeably involve the use of force, a particular act committed in the course of that employment might nonetheless be so outrageous as to bring it outside the realm of foreseeability.[1]

---

[1] It is important to note, at least from the standpoint of employer foreseeability, that some phases of police work are more fraught with the potential for physical confrontations with third parties than others. For example, that a policeman might use force in effectuating an arrest is entirely foreseeable. A suspect whose freedom is about to be restrained can be expected to offer resistance. Moreover, prior to arrest, the suspect could conceivably be armed and thus possess the means by which to provoke a confrontation which might eventuate in the use of force or violence. A custodial situation, like the one into which plaintiffs in this case were cast, presents none of these ominous potentialities. Plaintiffs had already been arrested and indeed handcuffed. Any physical aggression directed against them could not be deemed ordinary or foreseeable at this stage of the investigative process. Cf. Henderson v. Laclede Radio, Inc., supra. at 437; Potter Title & Trust Co. v. Knox, 113 A.2d 549, 552 (Pa. 1955).

Turning now to the merits of the foreseeability issue in this case, I find that the actions of the police officers were not so outrageous and excessively violent as to be outside the scope of their employment. That does not mean, however, that I am not in sympathy with the legal position espoused by the Government. For, just as public policy mandates that public servants be held individually accountable when they vent their spleen on the citizenry, likewise a point must be reached when actions which might normally be within the scope of their employment become so aggravated that the employer cannot justifiably be held responsible. Comment b. to § 229 of Restatement (Second) of Agency states that

[a]lthough an act is a means of accomplishing an authorized result, it may be done in so outrageous . . . a manner that it is not within the scope of employment. An assault . . . may be within the scope of employment, unless committed with such violence that it bears no relation to the simple aggression which was reasonably foreseeable.

In no less than three other sections of the Restatement is this principle recognized. See Restatement (Second) Agency, §§ 231 comment a.) ; 235 (comment c.) ; 245 (comment e.).

Had the maltreatment in this case reached the level of outright torture or brutality, as plaintiffs claim, I would be more apt to accept the Government's position herein and find the tortious acts to be outside the scope of the officers' employment. But, the transcript of Dr. Manuel Palaez, the medical doctor in charge of the Charles Harwood Memorial Hospital in February, 1971, belies beatings of such magnitude. This report reflects the plaintiffs' physical condition at 6:30 p.m., February 22, the same day the beatings were inflicted. True, the plaintiffs were injured sufficiently to cause Judge Joseph to have ordered them to the hospital. The ensuing examination, however, reveals

34

that the plaintiffs' injuries were only superficial bruises, the exact nature and extent of which will be dealt with in greater detail in the "Damage" portion of this opinion, infra. Although the plaintiffs' revelations of sadism were not contradicted by any Government witness, I find the doctor's transcript, a totally disinterested account, to be the more credible assessment of the injuries sustained by plaintiffs.

Plaintiffs in their "Reply to Defendant's 'Summation Brief' " allege that these tortious acts were motivated by a purpose to serve the Government by eliciting confessions from the three men. I cannot fully accept this characterization concerning the motivations of the police officers involved in the episode. To categorically assert that the sole motivation of the officers was to obtain confessions and thereby serve the ends of the Department of Public Safety is to ignore not only the ethnic complexities of our small island but also the community reaction to the death of Maria Felix. An eight-year-old Puerto Rican girl was kidnapped and murdered, and three black aliens were brought in as suspects in the case. The understandably strong feeling of moral outrage in the Puerto Rican community, characterized by parades and demonstrations in which the plaintiffs herein were burned in effigy, must have had an impact on the Puerto Rican police officers involved in these tortious acts. Indeed, the feeling on St. Croix was strong enough to justify a change of venue in the criminal cases to St. Thomas. Add to this the compelling fact that Officer Navarro, a participant at each stage of the maltreatment, was the second cousin of the murder victim. It thus becomes clear that such actions were at least partially motivated by personal or even racial considerations.

On the other hand, I cannot find that the desire to obtain confessions played no part in the use of force by the police

officers. Given this finding, I must hold the Government liable via respondeat superior. For, "[t]he liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge." Restatement (Second) of Agency § 245, comment f.

## III

### DAMAGES

As heretofore noted, plaintiffs' injuries were not severe. Both parties stipulated to the introduction of the former testimony of Dr. Palaez, apparently given at one or the other of the criminal prosecutions involving these individuals. According to the transcript of Dr. Palaez's testimony, Steele had swelling on his cheeks and forehead and complained of headaches. He further noted a pain in his chest, but no sign of injury could be detected in that area of the body. He returned to the hospital on February 25, complaining of insomnia, for which he was given one hundred milligrams of sodium butol.

Sampson's injuries consisted of a contusion on the anterior aspect of the chest wall, an edema on his upper lip, and an abrasion on his lower lip.

Mathurin, whose injuries were slightly more severe than those of his fellow plaintiffs, had lacerations on his scalp and right eyebrow, along with contusions on the chest and knees. Complaining of chest pains, he was returned to the hospital on February 23, where X rays revealed no indication of internal injury.

In their respective complaints, plaintiffs seek no reimbursement for medical bills, hospital care or treatment. Nor was there a claim for the loss of income or wages, past and future. Although Mathurin claimed at trial that he has experienced impaired vision in his left eye as the result of

the incidents described herein, this Court was presented with no medical evidence to support this assertion. Indeed, Dr. Palaez mentioned no such damage in his testimony. In the face of such a dearth of proof, I can award no damages for either permanent disability or disfigurement. As to any psychic, mental or emotional injury which plaintiffs might have suffered due to the incidents to which they were subject, again I must point to a surprising lack of medical proof.

■ On the face of this litigation, plaintiffs' claim for punitive damages would appear to have the strongest basis. However, Section 909 of the Restatement of Torts allows an award of punitive or exemplary damages against an employee because of the acts of its agents only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting within the scope of employment, or

(d) the employer or a manager of the employer satisfied or approved the act.

See also Openshaw v. Oregon Automobile Ins. Co., 487 P.2d 929, 932 (Idaho 1971); A. B. Lewis Co. v. Robinson, 339 S.W.2d 731, 734–35 (Tex. Civ. App. 1960).

Analyzed in the light of the foregoing provision, plaintiffs' punitive damage claim too must fail. Nothing in the record could conceivably point to either authorization or ratification of these acts by those in the upper eschelons of the Department of Public Safety or Virgin Islands Government. Nor was there any indication that any higher ranking officials were aware of the propensities of these named police officers to use unnecessary violence. They could not, therefore, be deemed reckless in maintaining

them in their positions. Finally, none of the officers involved can be deemed to have been in a managerial position in the Department of Public Safety in February, 1971.

■ What remains as the sole element of damages is that of past pain and suffering. The exact nature and extent of these injuries, as heretofore set forth in some detail, can only be termed "minor". For these superficial bruises, this Court awards each individual plaintiff the sum of $500.00.

■ Turning now to the issue of attorney's fees, I find that all parties to this litigation should bear their own costs, legal or otherwise. The Government's defense to this action was an entirely valid one and, I might add, one which needed to have been aired. Although plaintiffs did prevail in this action, I believe that a trial court, pursuant to the discretion afforded it by 5 V.I.C. § 541(b), need not assess attorney's fees against the losing party in an action in which there exists a genuine controversy, either of fact or law. The Government's liability herein was a close question. Furthermore, the true culpable parties—the individual police officers—were dismissed out of the case by plaintiffs, thereby leaving the Government whose liability was only derivative. Therefore, in the exercise of my discretion, I will make no allowance of attorney's fees and costs to the prevailing party as provided in 5 V.I.C. § 541(b).

### JUDGMENT

In accordance with the foregoing Memorandum Opinion and the reasons set forth therein, it is hereby

ORDERED, ADJUDGED AND DECREED:

(1) That plaintiff Gilliard Mathurin be awarded by the Government of the Virgin Islands the sum of $500.00;

(2) That plaintiff Gilbert Sampson be awarded by the Government of the Virgin Islands the sum of $500.00;

(3) That plaintiff Walcott Steele be awarded by the Government of the Virgin Islands the sum of $500.00; and

(4) That all parties to this litigation pay their own attorney's fees.