**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 16, 2012

# In the Court of Appeals of Georgia

A12A0494. SMITH v. LOTT.

PHIPPS, Presiding Judge.

After being terminated from employment, Shirley Smith, the former finance director of the City of Albany, filed a lawsuit against Alfred Lott, Albany's city manager, in Lott's personal capacity. In her complaint, Smith asserted claims for defamation, intentional infliction of emotional distress, and tortious interference with business/employment opportunities. Lott moved for summary judgment, and the trial court granted it, finding that suit against Lott was barred by his official immunity.

Smith appeals, contending that Lott was not entitled to official immunity because Lott made some statements with "actual malice" and some statements while he was not acting within the scope of his duties. We see no merit to these claims, and we affirm.

"On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[1] "The question of whether a government official is entitled to qualified immunity is a question of law for the court to decide."[2]

> The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.[3]

---

[1] *Giles v. Swimmer*, 290 Ga. 650, 651-652 (1) (725 SE2d 220) (2012) (citation and punctuation omitted).

[2] *Conley v. Dawson*, 257 Ga. App. 665, 666, 668 (2) (572 SE2d 34) (2002) (punctuation and footnote omitted).

[3] *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (punctuation and footnotes omitted); *Owens v. City of Greenville*, 290 Ga. 557, 561 (3) (b) (722 SE2d 755) (2012) (immunity applied to official act of city mayor); *Oglethorpe Dev. Group v. Coleman*, 271 Ga. 173 (2) (516 SE2d 531) (1999) (immunity applied to official act of city mayor); Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d); OCGA § 36-33-4 (" [O]fficers of a municipal corporation shall be personally liable to one who

2

"A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."[4]

In her complaint Smith asserted that

[w]hen Lott became City Manager, he endeavored to terminate certain City employees in order to replace them with individuals hand-picked by Lott. In removing Smith from her position, Lott wanted the public to perceive that Smith lacked integrity, credibility, and ethics in order to make Smith's termination appear reasonable and justified. As part of his smear campaign, Lott wrote letters, made public comments, and otherwise published remarks and criticisms about Smith that were misleading and/or false and which Lott knew would be further publicized in the media."

The trial court's order and judgment on Lott's motion for summary judgment states that a hearing on the motion was conducted and that the court "considered the full record and all submissions and arguments of counsel," in rendering its decision. The trial court stated that

---

sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law.").

[4] *Todd v. Kelly*, 244 Ga. App. 404, 406 (1) (535 SE2d 540) (2000) (punctuation and footnote omitted).

3

It is undisputed in this case that Smith, as the Director of the Finance Department of the City of Albany, was a department head directly accountable to City Manager Lott. Therefore, all disciplinary actions, and Smith's ultimate termination from employment, were matters left entirely to the discretion of Lott, under both the City Charter of the City of Albany and its personnel ordinance.

Smith does not contest the trial court's statement. According to the index to the appellate record, the record before this court does not contain a transcript of the hearing on Lott's motion for summary judgment or a reasonable substitute therefor, and Smith did not request that the clerk of the trial court transmit to this court a copy of the hearing transcript and any evidence attached thereto. We do not know what arguments and/or stipulations the parties made at the hearing. Thus we will assume in this case that the trial court was correct in stating that there was no dispute regarding Smith's accountability and Lott's discretion in disciplinary matters.[5]

---

[5] See *Lowry v. Norris Lake Shores Dev. Corp.*, 231 Ga. 547, 548 (203 SE2d 169) (1974) (affirming grant of summary judgment where the appellate record did not contain a transcript of evidence considered by trial court on motion and appellant did not request that a transcript of the proceedings be filed for inclusion of record on appeal; holding that court must necessarily assume trial court was correct in its *findings*); compare *Sapp v. Canal Ins. Co.*, 288 Ga. 681 (706 SE2d 644) (2011) (a transcript of the hearing on motion for summary judgment is not *always* necessary to resolve appeals arising from a trial court's determination on summary judgment; "[w]here, as here, all evidence was submitted to the trial court in advance of the hearing as required under OCGA § 9-11-56 (c), . . . and the hearing consisted simply

Smith set forth in her appellate brief, as well as in her trial court brief in response to Lott's motion for summary judgment, the circumstances surrounding four incidents from which Lott's alleged defamatory remarks originated.

*Business trip*. Smith asserts that Lott "began his [smear] campaign by defaming [her] for attending a . . . business trip authorized by the prior acting City Manager." She claims that upon her return from an annual business conference in Montreal, Canada, which she had attended for many years, Lott improperly "sanctioned her in a 'Disciplinary Action' personnel document" on the ground that her absence was unauthorized.

Smith claims that during an "open/public portion of a City Commission meeting," Lott commented that her attendance at the conference was an "intentional[] attempt[] to circumvent . . . policies of the City," that she had "violat(ed) standards of conduct for Albany Department Heads," and that her demonstrated behavior could "only be characterized as negligent, disingenuous and the epitome of bad judgment."

Smith asserts that although Lott claimed that he did not know about her plans to attend the conference beforehand, "[i]t is clear, though, that Lott knew about

of oral argument based on evidence already submitted, a transcript of proceedings is not required to enable meaningful appellate review").

5

Smith's intention to travel to the conference before it occurred. . . ." Smith claims that Lott knew because his administrative assistant, who traveled with Smith on the trip, testified that "when Lott came on board," she had "mentioned the fact that [she traveled with Smith] from time to time to [the] conferences," she told Lott that the next conference was going to be in Montreal, and Lott had joked with her to "brush up on her French."

But Smith deposed that she did not inform Lott that she was going on the business trip. And the record shows that although Smith obtained written authorization from the prior acting city manager to attend the conference, she did not request that the authorization be filed with the city manager's office. And Lott's administrative assistant deposed that although she had mentioned to Lott that she sometimes traveled with Smith to the conference, in this instance, she did not tell Lott with whom she might travel to the conference, and Lott did not ask; the trip was a personal one for the assistant.

Therefore, concluding that Smith's absence was unauthorized, Lott disciplined Smith by issuing a Disciplinary Action report which was placed in Smith's personnel file and copied to Smith; and by suspending Smith for four days without pay. Smith then filed a written response to the disciplinary report, and it was also placed in her

6

personnel file. Through an Open Records Act request, a local newspaper obtained the documents, and excerpts from the documents appeared in its papers.

*Investigation of finance department.* Smith asserts that "Lott next undertook to attack [her] by conducting a sham 'needs analysis' investigation of the Finance Department." Smith claims that "[a]t Lott's direction," the individual Lott hired to conduct an investigation of the department "caused the report to": (1) accuse Smith of having "directed her employees to break the law by directing her employees to pick up her children from school or other personal tasks during working hours"; and (2) conclude that Smith's actions were considered a crime known as "theft of services."

But the record shows that employees and former employees of the finance department reported to Lott their concerns about Smith's lack of preparedness for an upcoming audit; Smith's lack of effort to replace the department's accounts payable manager; and Smith's unfair treatment of some staff members.

As a result of the reports, Lott engaged the services of an individual ("assessor") to conduct a management assessment of the finance department. Some of the objectives of the assessment were to assess the leadership climate of the finance department, assess the department's readiness and preparedness for an upcoming audit, investigate the reasons behind employees leaving the department,

investigate allegations of retaliation and vindictiveness by Smith, investigate allegations of favoritism toward certain employees by Smith, assess the department's ability to manage accounts payable and receivable, and make a written review of the assessment.

Pursuant to that engagement, in August 2006, the assessor interviewed employees of the finance department. During those interviews, some employees reported that Smith had required them to pick up her children from school and to perform other personal tasks, errands, and favors for Smith and her children during normal work hours and in city-furnished vehicles; the assessor deposed that she relayed this information to Lott. Lott deposed that he consulted the city attorney regarding Smith's use of employees for personal matters and her use of city-furnished vehicles for personal errands, and that the city attorney told him that Smith's conduct constituted the crime of theft of services. The assessor deposed that Lott mentioned the term "theft of services" to her during one of her briefings to him.

The assessor included in her written report that Smith "directed her employees to break the law by directing [them] to pick up her children from school or [perform] other personal tasks during work hours. This is considered 'Theft of Service.'"

The City of Albany's police department later conducted an investigation of the allegations against Smith for her use of city vehicles and employees to perform personal tasks, errands, and favors; after conferring with the district attorney's office, "it was determined that there [was] not enough evidence to pursue a criminal charge to a successful conviction."[6]

*Lott's termination of Smith.* Smith asserts that when she met with Lott and he told her that her employment with the city would be terminated unless she resigned, Lott "further threatened" her that if she did not resign, she would go to jail.

Smith deposed that, in a nonpublic meeting, Lott offered her an opportunity to resign instead of being terminated; he told her that in that event, the assessor's findings would not be reduced to writing. Lott deposed that he explained to Smith that if the report was reduced to writing it would be "subject to a media request." Lott deposed that when he gave Smith the option to resign or be terminated, he also informed Smith that the assessor's findings showed that she had used employees for personal matters, while they were on duty, and that she had directed employees to pick up her children in government-owned cars and drive them to different places.

---

[6] The police department made this determination seven months after Smith was terminated from her employment.

But Smith requested that the assessor's findings be reduced to writing and a copy provided to her before she made a decision regarding resigning. Accordingly, the assessor submitted written reports that were required to be presented in an open meeting[7] to the city commission and mayor; Smith did not resign, and Lott terminated her employment.

Concerning the letter of termination issued by Lott, Smith asserts that she "contest[ed] the truth of Lott's statements" that she had committed "flagrant violations of personnel policies" and exhibited a "lack of respect for Georgia law."

*Smith's Orlando job search.* Smith asserts that after her employment with the City of Albany was terminated, she interviewed for a job with the City of Orlando. Smith claims that the interview went well, but that she was "passed over" after Lott transmitted by facsimile the assessor's report and disciplinary personnel documents to the interviewer, Raymond Elwell.

Elwell deposed that Smith informed him that she had been terminated from employment with the City of Albany. During the job interview, Smith volunteered her perspective of the issues involving her termination. She claimed she had been "targeted" for termination and she disputed the reasons for the termination. Elwell

---

[7] See OCGA §§ 50-14-1 (a) (1) (B); 50-14-3 (6).

10

informed Smith that he would follow up with Lott to get the City of Albany's perspective concerning the termination.

Elwell deposed that he spoke on the telephone with Lott about Smith's performance and termination. Lott told him that Smith had been "terminated for malfeasance . . . she abused some employees . . . [and] used some employees for personal gain." Elwell submitted an Open Records Act request and obtained a copy of the assessor's report. Smith was not offered the job.

The former human resources director for the City of Albany swore by affidavit that "[i]t was [the city's] *practice*," not to provide any information about a particular employee other than the employee's dates of service with the city and job title absent a signed authorization to release personal information. But that director had retired from her position with the city prior to Lott's disciplinary action against and termination of Smith, and she admitted that there was no *policy* that required Lott to obtain a written authorization to release personal information.

1. In her appellate brief, Smith lists two statements that she contends were defamatory and were "not made in the course of Lott's duties," such that immunity did not attach to them to bar her claims.

11

Smith claims that Lott made the first of these statements for a news story that was published on a television news website. The statement was that "my concerns are about the integrity of the organization, the ethics of the organization, and looking out for my employees . . ." Smith asserts that the second statement, made to Elwell, was that Smith was "terminated for malfeasance," that there was "evidence and corroboration" that Smith had "abused some employees," and that there was evidence Smith "had used some employees for personal gain."

Concerning the first statement, Smith does not cite any authority to support her position that this statement Lott made to the media after his discussions with the mayor and board of commissioners was outside the scope of his authority. Smith cites no authority to support her argument that a public official who acts when there is no specific duty to act, acts outside his authority. Indeed, taking action in this manner is, in part, what Lott was authorized to do in his discretion.[8]

---

[8] *Purvis v. Ballantine*, 226 Ga. App. 246, 249-250 (3) (487 SE2d 14 (1997) (holding that a school superintendent was a public official where evidence showed that he was the school's chief executive and operating officer, and that he kept the public informed about the operation of the school system and was routinely interviewed by the newspapers about the status of the school system); *Barr v. Matteo*, 360 U. S. 564, 574-575 (79 SC 1335, 3 LEd2d 1434) (1959) (under certain circumstances, a publicly expressed statement of the position of the head of an agency, in reference to charges that have been widely disseminated to the public, is an appropriate exercise of the discretion which the officer must possess to function

Concerning the second statement, Lott did not verbally disclose anything to Elwell that Elwell did not otherwise obtain through his Open Records Act request for information from Smith's personnel file regarding her termination.[9] And where a "personnel report is written by a supervisor who has the duty to write the report and it is sent to the keeper of personnel records, there is no publication of that report, and any allegedly defamatory material contained therein, no matter how malicious, is not actionable."[10] Although at one point the city may have had a practice of not releasing personnel information absent a signed release of information form by the employee, the record showed that no policy existed that prohibited Lott from verbally responding in conjunction with his response under the Open Records Act.

The trial court did not err in holding that suit was barred against Lott as to these statements.

---

effectively).

[9] See "Open Records Act," OCGA § 50-18-70 et seq.

[10] *Cartwright v. Wilbanks*, 247 Ga. App. 187, 189, 190 (3) (541 SE2d 393) (2000) (footnote omitted); *McDonald v. Few*, 270 Ga. App. 671, 673 (3) (607 SE2d 265) (2004); *Kurtz v. Williams*, 188 Ga. App. 14, 16 (3) (371 SE2d 878) (1988); *Luallen v. Home Mission &c. Convention*, 125 Ga. App. 456, 460 (2) (188 SE2d 138) (1972).

13

2. Smith contends that because Lott made some statements with actual malice, the trial court erred in finding that he was entitled to official immunity as to those statements.

(a) As an initial matter, Smith asserts that the applicable "actual malice" standard is that which "arises out of First Amendment jurisprudence and requires that a public figure [as herself] making a claim for defamation show that the defendant made the statements at issue with knowledge of their falsity or with reckless disregard for the truth."

"[I]n the context of official immunity, 'actual malice' requires a deliberate intention to do wrong."[11] "A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs."[12] "Actual malice" as it applies to official immunity, set forth in the 1991 amendment to Art. I, Sec. II, Par. IX of the Constitution of the State of Georgia, denotes "express malice or malice in fact," and not the "first amendment definition of 'actual malice' . . . which is unique to

---

[11] *Conley*, supra at 667-668 (2) (footnote omitted).

[12] *Murphy v. Bajjani*, 282 Ga. 197, 203 (4) (647 SE2d 54) (2007).

14

constitutional libel law. . . ."[13] In other words, "'[a]ctual malice,' as that term is used in the constitutional provision . . . does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others."[14] Thus, contrary to Smith's argument, the First Amendment standard of "actual malice" is not applicable here.

(b) In her appellate brief, Smith describes nine statements that she alleges were defamatory and were "made in the course of Lott's official duties, but to which immunity does not apply due to actual malice and intent to harm."

As described by Smith, the complained-of statements were as follows:

[1.] Lott's statement at [a city commission] meeting, as reported in [an] . . . article in [a local newspaper], that Smith had demonstrated behavior that "can only be characterized as negligent, disingenuous, and the epitome of bad judgment."

[2.] In a second article in [a local newspaper], . . . Lott was reported to have publicly declared his lack of confidence in Ms. Smith's abilities as finance director. The article further refers to Mr. Lott's chastisement of Ms. Smith in public settings for not being certified in her field (though she is).

---

[13] *Merrow v. Hawkins*, 266 Ga. 390, 391-392 (2) (467 SE2d 336) (1996).

[14] *Murphy*, supra (citation and punctuation omitted).

15

[3.] Lott stated to [the assessor], . . . that because of Smith, "good employees (were) leaving the department," that Smith was guilty of "blatant retaliation and vindictiveness," and that Smith "blatantly (showed) favoritism to certain employees to the detriment for the mission."

[4.] Lott told [the assessor] that Smith was guilty of the crime of "theft of services." This statement was repeated in the report generated and published by [the assessor].

[5.] In an open meeting, Lott referred to Smith and her performance as a "horrific situation." Lott also stated that Smith's attendance at the [business] conference . . . was an "unauthorized absence" that presented an "integrity/ethical problem."

[6.] Lott . . . stated in the public meeting that though he had been concerned that Smith's treatment of an employee was "racially motivated," his conclusion was that "the Director retaliated against everyone regardless of race" and "the circumstances were widespread and outrageous."

[7.] Lott further stated that "after realizing there existed clear violations of criminal law . . . he saw that he had to transition to greater level."

[8.] An article appearing in [a local newspaper] . . . , regarding Smith's termination quoted Lott as follows: "I expect I would find possibly some

16

slight policy violations . . . I had no idea the circumstances were as widespread and outrageous as they were."

[9.] Lott issued a letter, with a copy to be placed in Smith's personnel file (a public record), informing Smith that she would be terminated . . . for among other things, "flagrant violations of personnel policies" and "lack of respect for Georgia Law."

Concerning the first statement, Lott deposed that the statement was an accurate reflection of a comment he wrote in the disciplinary report he had issued to Smith that was placed in Smith's personnel file, and of which the local newspapers obtained a copy under the Open Records Act. Concerning the ninth statement, the termination letter was also contained in Smith's personnel file. These statements were not actionable.[15]

Concerning the second statement, Lott deposed that he did not make any statement to the newspaper chastising Smith for not being certified in her field. The record contains no information from any news reporter about the source of the statement.

What is published in a newspaper can not be received as being the act of another person, not shown to have had any connection with the

---

[15] See *Cartwright*, supra; *McDonald*, supra; *Kurtz*, supra; *Luallen*, supra.

publication of the paper, or to have authorized or ratified the publication of the article; nor is it alone evidence that such other person made statements so published. For such [words] to have furnished evidence against [Lott], there should have been some evidence connecting [him] therewith. . . . [T]he mere appearance of such [words] in its columns is not of itself proof as to who caused its publication.[16]

Concerning the third and fourth statements, Smith did not provide citations to the record that show that Lott made these statements to the assessor. And our review of the record reflects that Lott hired the assessor to investigate the finance department, and in doing so, he communicated to the assessor his concerns and objectives for an investigation. Thus, Smith has not shown a deliberate intention to do wrong or intent to cause the alleged harm suffered by Smith.

Concerning the sixth statement, contrary to Smith's assertion, the minutes of the public meeting did not reflect that it was Lott's conclusion that Smith retaliated against employees regardless of race. The minutes reflected that an employee made this statement to Lott.

Concerning the fifth, seventh, and eighth statements, the record showed that they were the product of reasoned conclusions reached by Lott from personal

---

[16] *Falls City Mfg. Co. v. Athens Coca-Cola Bottling Co.*, 130 Ga. 559, 562-563 (61 SE 230) (1908).

18

observations, careful deliberation, and as a consequence of information learned from an assessment of Smith and the department's performance; and not a deliberate intention to do wrong or intent to cause the alleged harm suffered by Smith.[17]

Accordingly, Smith's argument is without merit. The trial court properly determined that Lott was entitled to summary judgment based on his official immunity from liability as to all of Smith's claims for defamation, intentional infliction of emotional distress, and tortious interference with business/employment opportunities.[18]

*Judgment affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[17] See *Marshall v. Browning*, 310 Ga. App. 64, 67-69 (712 SE2d 71) (2011); *Todd*, supra at 406-407 (1) (though officer's actions in seeking warrants, which were later dismissed, was misguided, there was no evidence that they were taken with actual malice); *Purvis*, supra at 250-251 (3); *Teston v. Collins*, 217 Ga. App. 829, 830 (1) (459 SE2d 452) (1995) (a discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed).

[18] See generally *Purvis*, supra; *Davis v. Standifer*, 275 Ga. App. 769, 773 (1) (a) (621 SE2d 852) (2005) (where alleged tortious conduct arose from an incident occurring during the performance of officer's official duties, officer was cloaked with official immunity from suit, and all of plaintiff's state law claims, including plaintiff's state constitutional claims that arose out of the same allegations of underlying tortious conduct were barred).