**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**GOBEIL and LAND, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 31, 2022**

# In the Court of Appeals of Georgia

A22A1071. MOMMIES PROPERTIES, LLC et al. v. SEMANSON et al.

McFADDEN, Presiding Judge.

Mommies Properties, LLC and its manager, Vinay Bose — co-owners of property in Forsyth County that has been used as a commercial equestrian center — brought this action for damages and injunctive relief against a county commissioner, Laura Semanson, and a county inspector, Christopher Shane Pruitt, in their individual capacities. The plaintiffs asserted various claims under state and federal law, essentially alleging that the defendants misused their positions to impose stop work orders and take other actions that harmed the plaintiffs and their property.

After the trial court granted summary judgment to the defendants on all of the plaintiffs' claims, the plaintiffs brought this appeal. They argue that the trial court

erred in denying their request to present oral evidence at the summary judgment hearing, but the trial court did not abuse his discretion in this regard.

The plaintiffs also argue that the trial court erred in granting summary judgment to the defendants. As detailed below, we affirm the grant of summary judgment as to some of the claims but reverse as to others: (1) We affirm as to the damages claims brought under state law because the defendants had official immunity from liability. (2) We also affirm as to the claim for prospective injunctive relief for equal protection violations under state and federal law; while the plaintiffs correctly argue that immunity does not bar this claim, the trial court decided it on the merits and the plaintiffs make no argument on appeal that this merits ruling was incorrect. (3) We reverse as to the remaining claims for prospective injunctive relief under state and federal law; the trial court erred in holding that immunity shielded the defendants from these claims, and we decline to affirm as right for any reason because the defendants did not argue other, meritorious grounds for summary judgment to the trial court. (4) Finally, we affirm as to the claims for punitive damages and attorney fees and expenses, because the plaintiffs do not argue on appeal that those rulings were erroneous.

1. *Record citation deficiencies.*

2

As an initial matter, we note that neither side's briefs follow our court rules for record citations. Those rules specify, and have specified throughout the life of this case,[1] how electronic records are to be cited. Citations should identify "the PDF page number within [the applicable] volume [number of the electronic record.]" Court of Appeals Rule 25 (d) (2). And some of the citations in the briefs do not correspond to the facts asserted. And moreover, the briefs purports to support factual representations with citations to materials in the appellate record that are not proper summary judgment evidence, such as arguments in the briefs that Bose filed below in opposition to summary judgment or factual recitations in the trial court's summary judgment order. These citations are not helpful to our appellate review. See *In the Interest of T. L.*, 285 Ga. App. 526 n. 4 (646 SE2d 728) (2007) (physical precedent) (finding appellate brief's citation to trial court's order to be "unhelpful" to our effort to identify evidence relevant to the issue on appeal); *Luong v. Tran*, 280 Ga. App. 15, 18 (2) n. 17 (633 SE2d 797) (2006) (noting that citations to the trial court's order and

[1] The current version of Court of Appeals Rule 25, which governs the structure and content of briefs, became effective August 30, 2022. Although Rule 25 was modified and renumbered during the course of the briefing in this appeal, the requirement that citations be by PDF page number also existed in the former versions that applied to the parties when their filed their briefs in this case. See Former Court of Appeals Rule 25 (d) (2) (effective June 10, 2022); former Court of Appeals Rule 25 (c) (3) (effective Jan. 11, 2022).

to counsel's argument on summary judgment are not citations to evidence contained in the record); *Sullivan v. Fabe*, 198 Ga. App. 824, 827 (3) (403 SE2d 208) (1991) (holding that a trial court brief "is not proper evidence" on summary judgment) (citation and punctuation omitted).

These deficiencies have hindered our appellate review. By failing to provide proper record citations, the parties to this appeal run the risk that we will miss evidence relevant to their arguments. "While it is possible that [such evidence] exists somewhere in the appellate record[ ], we have repeatedly held that it is not the function of this court to cull the record on behalf of a party. This rule is particularly true in cases, such as this one, with a voluminous record." *In/Ex Systems v. Masud*, 352 Ga. App. 722, 723 (1) (835 SE2d 799) (2019) (citations and punctuation omitted).

2. *Facts and procedural history.*

"On appeal from the grant of summary judgment, legal questions are reviewed de novo, and this [c]ourt also conducts a de novo review of the evidence, viewed in the light most favorable to the nonmoving party, to determine if there is a genuine issue of material fact." *Barnett v. Caldwell*, 302 Ga. 845-846 (I) (809 SE2d 813) (2018) (citations omitted).

4

So viewed, and recognizing the limitations discussed above in Division 1, the evidence shows that the plaintiffs own property adjacent to the Chattahoochee River. There are stables on the property and for many years the property has been used for commercial equestrian activities. The plaintiffs have an ongoing dispute with the homeowners association of an adjacent subdivision about the subdivision's rights in the property and the association's characterization of the stables as a subdivision amenity. See *Richards v. Bose*, 354 Ga. App. 801 (841 SE2d 78) (2020). Semanson is a Forsyth County commissioner whose district includes the subdivision.

In September 2017, the plaintiffs petitioned the board of commissioners for a conditional use permit to build a 2,500 square foot caretaker residence within the barn on the property, to be used for an on-site resident manager for the stables. Although caretakers had lived on the property in the past, at the time of the CUP application no one was living there and there was no habitable space on the property. In anticipation of the caretaker residence construction, Bose arranged for utility work to be done on the property.

In the fall and early winter of 2017, Semanson received several complaints from persons in the subdivision about land disturbances and other activities on the property. Some of those complaints appear to be about trenches that were dug on the

5

property in connection with the utility work. The complaints also expressed concern that the plaintiffs were using the property in ways inconsistent with its zoning.

Semanson asked staff in various county departments to investigate the complaints. She also drove to the property and, from a public road, observed what she believed to be land disturbance.

In mid-December, Pruitt, then a soil erosion inspector in the county's engineering department, visited the property several times and took photographs but took no enforcement action. Another person in that department also visited the property and reported that the utility work did not need a permit but that other code enforcement issues might exist.

Semanson, who continued to receive complaints about the property, was dissatisfied with this response. She did not know whether the work on the property violated any ordinances; nevertheless, she sent numerous emails to other officials and employees at the county asking code enforcement to keep the property under observation, seeking additional responses to the concerns she had raised, opining that a stop work order should issue, and sometimes expressing her frustration at what she perceived to be inaction.

6

On December 28, 2017, Pruitt returned to the property. He did so at the request of someone in the code enforcement department, who had received a report from Semanson about a complaint that dirt was being trucked onto the property. The property was gated and a "no trespassing" sign was posted, and previously Bose had told enforcement officers not to enter the property unless he was present. The code enforcement department had a policy not to enter a property under such circumstances. Nevertheless, without a warrant or Bose's permission, Pruitt entered the property by climbing under the gate. He believed he was authorized to enter the property under a county ordinance as part of his investigation into a reported land disturbance. While there, Pruitt saw "four tandem dump truck loads of dirt that had been dumped on the [p]roperty" and he issued a stop work order for land disturbance without a permit.

Pruitt then spoke to Bose on the telephone and informed him of the stop work order. Bose replied that the dirt was topsoil to be used for re-grassing pastures, a regular activity that he understood not to require a land disturbance permit. Pruitt informed Bose that he could not resolve the stop work order and that Bose would have to address it with other county employees. After issuing the stop work order, Pruitt began regularly monitoring the property.

On January 29, 2018, staff in the county's planning department issued a second stop work order, citing "grading without a permit in the MRPA corridor." One purpose of that stop work order was to ensure that the property was in compliance with state law regulating "development adjacent to major streams in certain metropolitan areas. . . ." OCGA § 12-5-442 (a); see generally OCGA § 12-5-440 et seq. (the Metropolitan River Protection Act).

The stop work orders had the effect of shutting down the plaintiffs' equestrian operations and contributed to significant deterioration of the property. Bose attempted to resolve the issue with the county and get the stop work orders lifted, but he was unable to do so. Ultimately he challenged the stop work orders and other rulings relating to the property with the county's zoning board of appeals.

In the spring of 2018, Semanson met with persons from the homeowners association about their concerns regarding the plaintiffs' pending permit application. And in the summer of 2018, the county board of commissioners held a public hearing on the application, at which subdivision residents expressed opposition. Bose asked Semanson to recuse from voting on the application, but she refused. The board of commissioners ultimately approved a permit for construction of a caretaker residence of no more than 850 square feet, with the following condition: "A Certificate of

Occupancy will not be issued until all codes and regulations of Forsyth County have been satisfied on the property inside and outside the building." This included resolving the two stop work orders. Bose, who wanted to construct residences for two caretakers and their families, considered the approved permit to be "useless."

After the hearing on the permit application at which Bose had asked Semanson to recuse, the property came under the scrutiny of the Army Corps of Engineers, which contacted Bose about potential violations of federal law based on information it had received that the plaintiffs had rerouted a stream on the property. Bose believes Semanson instigated this investigation. Ultimately, no problem was identified.

Later in 2018, in response to questions from subdivision residents, Semanson looked into whether a blocked road on the property impeded emergency or other necessary government access. It was determined that there was no problem with the road.

The plaintiffs filed this action on August 14, 2019 against Semanson and Pruitt in their individual capacities. Against both defendants they asserted state law claims for invasion of privacy, trespass, and intentional interference with business relations, seeking damages and injunctive relief for the first two of those claims and only damages for the third. Against Semanson they also asserted an equal protection claim

under both state and federal law and a claim for First Amendment retaliation under federal law (alleging Semanson retaliated after Bose asked her to recuse from ruling on the permit application); they sought only injunctive relief as to those claims. And they sought punitive damages and attorney fees and expenses.

In March 2021, we issued a decision in *Forsyth County v. Mommies Properties*, 359 Ga. App. 175 (855 SE2d 126) (2021), an appeal arising from the plaintiffs' proceeding before the zoning board of appeals challenging the stop work orders and other decisions regarding the property. After an evidentiary hearing, the board had found against the plaintiffs, and in *Forsyth County* we held that the evidence presented at that hearing supported the board's decision. Id. at 192-195 (6), (7), (8). Our Supreme Court denied the plaintiffs' petition for certiorari in that case.

The parties discuss *Forsyth County* in some detail. But we conclude that we do not need to decide its legal effect. In that case we concluded that evidence presented to the zoning board of appeals authorized its decision to uphold the stop work orders and the county's other actions. In this case we need only recognize that the plaintiffs have exhausted their avenues for directly challenging the propriety of the stop work orders and other county actions. So they cannot use this case to collaterally attack the board's rulings.

10

A few months later, the defendants moved for summary judgment against all of the plaintiffs' claims. They argued that our decision in *Forsyth County*, supra, precluded the claims; alternatively, they argued that they were entitled to official immunity and, in the case of Semanson, immunity under OCGA § 51-1-20 (a). Among other things, the plaintiffs argued in response that the *Forsyth County* decision had no preclusive effect, that the defendants were not entitled to immunity because they acted both outside the scope of their authority and with actual malice, and that, in any event, immunity was not a bar to their claims for prospective injunctive relief.

The trial court granted summary judgment to the defendants on all of the claims. Although the trial court agreed with the plaintiffs that the earlier *Forsyth County* decision did not preclude the claims, the trial court resolved all of the claims except the equal protection claim on immunity grounds, holding that both defendants were entitled to official immunity and that Semanson was also entitled to immunity under OCGA § 51-1-20 (a). The trial court resolved the equal protection claim on the merits, holding that no genuine issue of material fact existed to preclude summary judgment.

3. *Denial of motion for oral evidence at summary judgment hearing.*

The plaintiffs enumerate as error the trial court's "fail[ure] to consider evidence offered that Semanson had engaged in similar acts showing intent and state of mind." This claim appears to concern an order in which the trial court denied the plaintiffs' motions to present oral testimony at the summary judgment hearing. "The law creates no obligation on the court to permit the use of oral evidence at this kind of hearing[,]" *Gunter v. Nat. City Bank*, 239 Ga. 496, 497 (238 SE2d 48) (1977), and "[d]enial of a request to [do so] is not ground for reversal." *Price v. Star Svc. & Petroleum Corp.*, 119 Ga. App. 171, 179 (3) (166 SE2d 593) (1969). Whether to do so was a matter within the trial court's discretion. *Springer v. Gaffaglio*, 190 Ga. App. 272, 273 (2) (378 SE2d 691) (1989). The plaintiffs have not shown that the trial court abused his discretion in that regard.

4. *Summary judgment on state law claims for damages.*

The trial court correctly granted summary judgment, on official immunity grounds, on the plaintiffs' state law claims against Semanson and Pruitt for damages (invasion of privacy, trespass, and intentional interference with business relations).

The doctrine of official immunity applies to claims brought against public officers and employees in their individual capacities. *Howell v. Willis*, 317 Ga. App. 199, 200 (729 SE2d 643) (2012). Previously established in Georgia case law, official

12

immunity was made a part of Georgia's constitution in 1991. See *Gilbert v. Richardson*, 264 Ga. 744, 752 (6) (452 SE2d 476) (1994). Our constitution now provides:

> Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.

Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d).

Under this provision, public officers and employees "may be held personally liable for negligence relating to their official duties only when performing 'ministerial' acts; 'discretionary' acts are only subject to suit when performed with actual malice or intent to cause injury." *Williams v. DeKalb County*, 308 Ga. 265, 278 (4) (c) (840 SE2d 423) (2020) (citation and punctuation omitted). This doctrine

13

recognizes "the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits." *Gilbert*, 264 Ga. at 750 (4) (quoting Restatement (Second) of Torts, § 895D, comment b).

(a) *The acts at issue were discretionary.*

The plaintiffs do not appear to challenge the discretionary nature of the acts that they cite as the basis for the defendants' liability. "(A) discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Roper v. Greenway*, 294 Ga. 112, 116 (751 SE2d 351) (2013) (citation, punctuation, and emphasis omitted). The acts at issue in this case — Semanson's response to questions and concerns about suspected code violations on the plaintiffs' property and vote on the permit, and Pruitt's inspection of the property and response to what he perceived to be land disturbance violations — required an exercise of personal deliberation and judgment. See *King v. Comfort Living*, 287 Ga. App. 337, 340 (2) (651 SE2d 484) (2007) (holding that, to the extent a city's mayor and council were involved in decision-making regarding the construction of a water line to the plaintiff's property, such decisions were discretionary); *Happoldt v. Kutscher*, 256 Ga. App. 96, 100 (1) (567 SE2d 380) (2002) (where a subdivision review officer was

14

"required to exercise personal deliberation and judgment in determining whether [drainage] standards ha[d] been met, his determination was discretionary in nature").

(b) *The acts were taken in the performance of official functions.*

The plaintiffs assert that the defendants were not entitled to official immunity because their acts fell outside the scope of their official authority. See *Gilbert*, 264 Ga. at 753 (6) (the term "official functions," as used in Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d), means "any act performed within the officer's or employee's scope of authority"). We disagree.

(i) *Semanson*.

The evidence to which the plaintiffs point in support of their claims shows that Semanson forwarded issues, complaints, and concerns raised by citizens to county employees whom she believed to be in a position to address those issues, and she encouraged those persons to resolve them. County employees described this type of behavior as common for county commissioners, and the plaintiffs offer no persuasive argument for why such acts would fall outside the scope of a county commissioner's official authority. Indeed, in their response to the statement of undisputed facts that the defendants filed with the trial court, the plaintiffs agreed that "[c]ommissioners may respond to public citizen complaints and forward same to the appropriate

15

department"; and that "[c]ommissioners may ask that an issue be investigated or ask that a stop work order may issue[.]"

We find no merit in the plaintiffs' argument that, to fall within the work of a county commissioner, such constituent advocacy activities must be specifically enumerated as part of the powers afforded by law to county governing authorities. See *Smith v. Lott*, 317 Ga. App. 37, 43 (1) (730 SE2d 663) (2012) (absent authority to the contrary, rejecting "argument that a public official who acts when there is no specific duty to act, acts outside his authority").

We also are not persuaded by the plaintiffs' broad argument, based on this court's opinion in *Hodges v. Youmans*, 122 Ga. App. 487 (177 SE2d 577) (1970) (physical precedent as to Div. 2), that a "county commissioner has no official immunity for torts caused by her personal engagement in code enforcement." In *Hodges*, we reversed a grant of summary judgment to a county commissioner whom the plaintiff alleged had "used his office as commissioner oppressively, maliciously, corruptly, and outside the authority of the law" to "further [a] conspiracy" to prevent the plaintiff's construction and operation of a trailer park, by, among other things, "issuing a stop work order, . . . voting to revoke [the plaintiff's] permit to construct [a] trailer park, and, when he failed in this endeavor, . . . vot[ing] to deny [the]

16

plaintiff a business license[.]" Id. at 488 (punctuation omitted). But as physical precedent, the division in *Hodges* upon which the plaintiffs rely is not binding authority. See Court of Appeals Rule 33.2 (a) (2). And we do not find it persuasive for two reasons.

First, the *Hodges* decision differs from this case on a key factual point. Unlike Semanson, the commissioner in *Hodges* himself issued the stop work order. *Hodges*, 122 Ga. App. at 490 (2). Although the plaintiffs characterized Semanson as essentially "dictating" the issuance of the stop work orders in this case, they have not pointed to evidence supporting that characterization. Instead, the evidence viewed in the light most favorable to the plaintiffs shows that, while Semanson strongly advocated for the issuance of a stop work order, that decision ultimately was made by other persons within the county. Again, the plaintiffs conceded as much in response to the defendants' statement of undisputed material facts, agreeing that "[c]ommissioners requests are not binding on the respective departments and [c]ommissioners do not have the ability or authority to order any specific action to be taken."

Moreover, we are not convinced that the analysis in *Hodges* remains sound. We decided *Hodges* before the doctrine of official immunity was made part of our state

17

constitution, and the analysis in *Hodges* arguably relies on a more narrow interpretation of official immunity than what our constitution now demands. Compare *Hodges*, 122 Ga. App. at 491 (2) (holding that official immunity is not extended to a public officer who "do[es] things not authorized by law, *or* act[s] in a wanton *or* malicious way and with intent to injure the property of another") (emphasis supplied; other emphasis omitted) with Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d) (providing that public officers and employees are not subject to suit or liability for discretionary acts in the performance of their official functions unless "they act with actual malice or with actual intent to cause injury").

(ii) *Pruitt*.

To the extent the plaintiffs also argue that Pruitt was acting outside of his official authority, we disagree. By definition, Pruitt's role as a county soil and erosion inspector involved the inspection of properties for suspected violations, and his act of entering the plaintiffs' property in the course of such an inspection fell within the scope of his official authority even if, as the plaintiffs allege, he should not have entered without a warrant or the plaintiffs' permission. See *Taylor v. Waldo*, 309 Ga. App. 108, 110 (1) (709 SE2d 278) (2011) (a police officer was entitled to official immunity for his exercise of discretion in determining that an act fell within his

official authority, even if that determination was wrong). See also *Cameron v. Lang*, 274 Ga. 122, 125 (2) (549 SE2d 341) (2001) (affirming grant of summary judgment based on official immunity to law enforcement officer who, while engaged in a high speed pursuit against a suspect, ran a stop sign without turning on his blue lights or siren); *Qenkor Constr. v. Everett*, 333 Ga. App. 510, 522 (3) (d) (773 SE2d 821) (2015) (finding that a sheriff's allegedly unauthorized seizure and retention of cash during a search was a discretionary act that occurred while the sheriff was "acting within the scope of his official duties," such that official immunity would "shield [the sheriff] from liability on [the plaintiff's] conversion claim unless [the plaintiff could] show that [the sheriff] acted with actual malice or with actual intent to cause injury") (citation and punctuation omitted).

(c) *The plaintiffs have not pointed to evidence showing actual malice or an actual intent to cause injury.*

We also conclude that the plaintiffs have not shown the necessary actual malice or actual intent to cause injury. "In the context of Georgia's official immunity doctrine, 'actual malice' requires a deliberate intention to do wrong. A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs."

19

*Williams*, 308 Ga. at 278-279 (4) (c) (citations and punctuation omitted). "Moreover, the phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Wyno v. Lowndes County*, 305 Ga. 523, 531 (3) (824 SE2d 297) (2019) (citation and punctuation omitted). This standard "applies equally to all public employees, regardless of the power they wield and regardless of the type of harm done." *Wilson v. Cromer*, 356 Ga. App. 763, 766 (1) (847 SE2d 213) (2020).

In their motion for summary judgment, the defendants pointed to evidence negating the plaintiffs' claim that they acted with actual malice or intent to injure. For example, in her deposition Semanson denied directing staff to take any particular action in response to her requests that they investigate citizen complaints, and she denied ever using her role as a commissioner to retaliate against someone for doing something she did not like. And Pruitt testified in his affidavit that he believed that a county ordinance authorized him to enter the plaintiffs' property as part of his investigation into suspected land disturbance. So to avoid summary judgment, the plaintiffs were required to point to specific evidence giving rise to a triable issue on

that point. See *Cowart v. Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779) (2010). As detailed below, they have not done so.

(i) *Semanson.*

Viewed in the plaintiffs' favor, the exchange of emails between Semanson and other county officials and employees in late 2017 suggests that she aggressively pursued the enforcement of code and zoning regulations against them on behalf of residents of the adjacent subdivision without knowing whether or not enforcement actions were appropriate. The plaintiffs rely heavily on this evidence to argue that Semanson acted with actual malice. They also point to deposition testimony in which Semanson called some of Bose's actions "creepy," to Semanson's later inquiries into the blocked access road, and to her suspected involvement in the investigation by the Army Corps of Engineers to suggest that Semanson did not like them.

But actual malice "requires more than harboring bad feelings about another." *Adams v. Hazelwood*, 271 Ga. 414, 415 (2) (520 SE2d 896) (1999). "Evidence demonstrating frustration, irritation, and possibly even anger is not sufficient to penetrate official immunity, nor is proof of ill will, unless the ill will is combined with the intent to do something wrongful or illegal." *Wilson*, 356 Ga. App. at 765-766 (1) (citation and punctuation omitted). See also *Adams*, supra; *Selvy v. Morrison*, 292

21

Ga. App. 702, 705 (665 SE2d 401) (2008); *Anderson v. Cobb*, 258 Ga. App. 159, 160 (2) (573 SE2d 417) (2002).

There is also no evidence that Semanson pushed for enforcement actions that she believed were unwarranted. Compare *Schultz v. Lowe*, 364 Ga. App. 345, 358-359 (2) (874 SE2d 842) (2022) (trial court did not err in granting summary judgment to a law enforcement officer based on official immunity where there was no evidence from which a jury could infer that the officer knew his arrest of the plaintiff was groundless) with *Bateast v. DeKalb County*, 258 Ga. App. 131, 132 (572 SE2d 756) (2002) (where there was evidence that law enforcement officers arrested the plaintiff for a crime that they knew she did not commit, the officers were not entitled to summary judgment on official immunity grounds because a jury could reasonably infer that they deliberately intended to do a wrongful act and acted with actual malice). Although the plaintiffs suggest that Semanson should have taken steps to verify the citizen complaints before referring them to other county officials for action, any inadequate investigation on her part is not enough to "show a deliberate intent to commit a wrongful act or to harm [the plaintiffs]." *Anderson*, 258 Ga. App. at 161 (2).

And for purposes of official immunity in this case, it does not matter whether or not any further enforcement action was appropriate. The fact that a government

22

officer or employee exercised poor judgment or that his or her decisions were "misguided" or "flawed" is not evidence of actual malice that would deprive the officer or employee of official immunity. See *Selvy*, 292 Ga. App. at 705; *Marshall*, 310 Ga. App. 64, 69 (712 SE2d 71) (2011). Even if Semanson "was motivated by [an incorrect] perception that [the defendants were in violation of local codes or other laws], this does not show an intent to do wrong." Id. at 70.

There also is no evidence that Semanson dictated any enforcement decision reached by the persons who investigated the complaints. As stated above, the plaintiffs agreed with the defendants' statement of undisputed fact that Semanson did not have the ability or authority to order any specific action to be taken. Pruitt, who issued the first stop work order, testified that he was asked to investigate by someone other than Semanson. The head of the planning department, which issued the second stop work order, testified that he did not rely on statements by Semanson in connection with it. Semanson was one of five commissioners voting on the plaintiffs' permit application. The plaintiffs have pointed to no evidence to the contrary.

Simply put, the plaintiffs have "not pointed to any legal authority to support [their] claim that the jury could infer actual malice [from Semanson's efforts to have their activities on the property investigated and any code violations addressed]."

23

*Wilson*, 356 Ga. App. at 766 (1). Their theory for avoiding the shield of official immunity is illustrated by Bose's deposition testimony, in which he opines that Semanson used other county officials and employees to do the bidding of the homeowners association, in order to garner votes for her own personal gain. Their argument that Semanson's actions demonstrated actual malice "requires that we speculate and make assumptions that simply are not justified by the record, even viewed most favorably to [the plaintiffs]." *Conley v. Dawson*, 257 Ga. App. 665, 668 (2) (572 SE2d 34) (2002).

(ii) *Pruitt*.

There is also no evidence that Pruitt acted with actual malice or an intent to injure the plaintiffs. As stated above, Pruitt testified that he believed a county ordinance permitted him to enter the property without a warrant or the plaintiffs' permission, and even if he was wrong on that point, "the immunity from civil liability given to public officers for a mistake in judgment extends to errors in the determination both of law and of fact." *Wallace v. Greene County*, 274 Ga. App. 776, 780 (1) (618 SE2d 642) (2005) (citation and punctuation omitted). This principle also applies to any errors in Pruitt's conclusion that the activities he observed on the property merited a stop work order. See *Reed v. DeKalb County*, 264 Ga. App. 83, 86-

24

87 (589 SE2d 584) (2003) ("Even assuming [law enforcement officers'] actions in arresting [the plaintiff] may have been misguided, there is no evidence that they were taken with actual malice.") (citation and punctuation omitted); *City of Atlanta v. Heard*, 252 Ga. App. 179, 182-183 (2) (555 SE2d 849) (2001) (even if detectives' investigation was flawed, they were entitled to immunity for their decision to arrest the plaintiff). And there is no evidence that Pruitt's subsequent inspections of the property, while numerous, were anything other than routine measures to assess compliance with the stop work orders, which remained in effect.

5. *Summary judgment on equal protection claims.*

As for the equal protection claims, the plaintiffs have not shown that the trial court erred in granting summary judgment. The plaintiffs asserted those claims only against Semanson. So the trial court's mention of Pruitt in that part of the opinion is surplusage, and we do not address it.

The grant of summary judgment to Semanson on the equal protection claim was on the merits. The trial court found no evidence that the plaintiffs were similarly situated to others who had received different treatment.

The defendants argue that the plaintiffs did not enumerate this ruling as error on appeal. We disagree. "An error of law has as its basis a specific ruling made by the

25

trial court. In order for a Georgia appellate court to review a trial court ruling for legal error, a party must set forth in the enumeration of errors the allegedly erroneous ruling. OCGA § 5-6-40." *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999). Parties often summarize their arguments in their enumerations of error. That is often helpful. But it is surplusage. See OCGA § 5-6-51 (4) (setting out an example of an enumeration of errors "declared to be sufficient").

Here it is apparent that the legal error the plaintiffs' various enumerations of error challenge is the grant of summary judgment. "The individual facets of [the plaintiffs'] attack on the legal ruling with which they took issue are arguments in support of a legal position and are not, in and of themselves, errors of law." *Felix*, 271 Ga. at 539. They are sufficient. Our Appellate Practice Act provides that

> [w]here it is apparent from the notice of appeal, the record, the enumeration of errors, or any combination of the foregoing, what judgment or judgments were appealed from or what errors are sought to be asserted upon appeal, the appeal shall be considered in accordance therewith notwithstanding that . . . the enumeration of errors fails to enumerate clearly the errors sought to be reviewed.

OCGA § 5-6-48 (f). This Code section "impose[s] on the appellate courts a statutory duty to discern what errors an appellant is attempting to articulate." *Felix*, 271 Ga. at 538.

Nevertheless, the plaintiffs have not shown that they are entitled to reversal on their equal protection claims. Immunity was not the basis upon which the trial court granted summary judgment on the equal protection claims; instead, the trial court ruled on the merits. While in the midst of their immunity argument, the plaintiffs cursorily assert that there was evidence to show that they were "similarly situated members of a class that were treated differently[,]" they provide no meaningful analysis or argument on the merits of those claims. We will not speculate or make that argument on their behalf. See *Harmon v. Innomed Technologies*, 309 Ga. App. 265, 270 (1) (b) (709 SE2d 888) (2011).

6. *Summary judgment on other claims for injunctive relief.*

The trial court granted summary judgment to the defendants on immunity grounds on the other claims for prospective injunctive relief: invasion of privacy, trespass, and as to Semanson, First Amendment retaliation. But there is an "understanding in American law generally that the personal immunities of public officers typically do not extend to prospective relief." *Lathrop v. Deal*, 301 Ga. 408,

27

437 (III) (C) (801 SE2d 867) (2017). Our Supreme Court has expressly held this to be so for official immunity, see id. at 444 (III) (C) (holding that official immunity "concerns suits and liabilities of public officers for monetary damages and other retrospective relief [and d]oes not limit the availability of prospective relief"), and has acknowledged federal authority applying the same principle to qualified immunity against federal claims. See id. at 437 (III) (C) (citing *Wood v. Strickland*, 420 U. S. 308, 314 (II) n. 6 (95 SCt 992, 43 LE2d 214) (1975) and *Morse v. Frederick*, 551 U. S. 393, 432 (127 SCt 218, 168 LE2d 290) (2007) (Breyer, J., concurring in part and dissenting in part)). We discern no reason why the same would not also be true for the immunity provided to members of a local government board under OCGA § 51-1-20 (a) (the alternative ground identified by the trial court for Semanson's immunity); that Code section, like the constitutional provision establishing official immunity, provides for immunity from "liability." See generally *Lathrop*, 301 Ga. at 440-443 (III) (C) (reasoning that the term "liability" within Ga. Const. of 1983, Art. I, Sec. I, Par. IX (d), which establishes official immunity, refers to retrospective rather than prospective relief). For this reason, we agree with the plaintiffs that the trial court erred in holding that immunity shielded the defendants from the claims for prospective injunctive relief.

And we decline to affirm under the right-for-any reason doctrine, which provides that a "grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond." *Ga.-Pacific v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013) (citations, punctuation, and emphasis omitted). See *City of Gainesville v. Dodd*, 275 Ga. 834, 837-838 (573 SE2d 369) (2002). The defendants did not argue the merits of the claims for injunctive relief in the court below. Although they now argue that the evidence does not demonstrate the substantial threat of irreparable injury needed for injunctive relief, in the trial court they argued only that they were entitled to immunity.

In considering whether to apply the right-for-any-reason doctrine, we acknowledge that the trial court, in his summary judgment order, concluded that Pruitt's entry upon the property was constitutional under the "open fields doctrine." That doctrine declines to extend Fourth Amendment protections to

> "open fields" that are not an immediate part of a dwelling, regardless of the property owner's subjective expectation of privacy. . . . In developing this doctrine, the [United States Supreme] Court has adopted

29

a broad definition of the term "open fields," expanding it to include any unoccupied or undeveloped area outside of the curtilage.

*Morse v. State*, 288 Ga. App. 725, 727 (1) (655 SE2d 217) (2007) (citing *United States v. Dunn*, 480 U. S. 294, 303-304 (107 SCt 1134, 94 LE2d 326) (1987) and *Oliver v. United States*, 466 U. S. 170, 178-179 (104 SCt 1735, 80 LE2d 214) (1984)) (other citations and punctuation omitted).

We assume without deciding that the property in this case is an "open field" for the purpose of that doctrine, but this does not permit us to affirm the plaintiffs' claims for injunctive relief against Pruitt for trespass and invasion of privacy as right for any reason.

The "open fields" doctrine concerns the extent of Fourth Amendment protection. But "[p]roperty rights are not commensurate with Fourth Amendment privacy rights." *State v. Clark*, 263 Ga. App. 480, 485-486 (c) (588 SE2d 254) (2003) (suggesting that the government's intrusion upon an "open field" could be a trespass at common law even if it is not a search implicating Fourth Amendment rights). The parties made no arguments below about whether the "open fields" doctrine provides a defense to the injunctive relief claims against Pruitt, notwithstanding the search's

30

constitutionality under the Fourth Amendment. So we will not apply the right-for-any-reason doctrine to affirm those claims. See *Ga.-Pacific*, 293 Ga. at 504 (2).

7. *Summary judgment on claims for punitive damages and attorney fees and expenses.*

The plaintiffs make no argument that the trial court erred in granting summary judgment to the defendants on their claims for punitive damages and attorney fees and expenses. To the extent those claims are part of the plaintiffs' enumerated errors, they are deemed abandoned. Court of Appeals Rule 25 (d) (1). See *Nalley v. Langdale*, 319 Ga. App. 354, 363 (2) n. 16 (734 SE2d 908) (2012) (physical precedent).

*Judgment affirmed in part and reversed in part. Gobeil and Land, JJ., concur.*